SUZANNE PULLINS, PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 23793–08.             Filed May 5, 2011.

P filed joint tax returns with her husband—timely for tax year 1999 and untimely (in October 2004) for 2002 and 2003. Each return showed a balance due that was not paid when the return was filed. P signed the returns but did not review or question them. She knew or should have known that the taxes reported on them were not fully paid, but she did not know that her former husband had omitted income from one of the returns. She received no specific benefit from the non-payment of the taxes. In 2003 the IRS issued a levy notice to P for 1999. P and her former husband separated in late 2004. In 2005 the IRS issued levy notices for 2002 and 2003. There-after, P divorced her former husband, and the State court allocated all of the couple's tax debts to him and awarded him proceeds from the sale of their jointly owned house, from which proceeds he could have paid the liabilities. P requested "innocent spouse" relief from the IRS on April 22, 2008 (more than 2 years after the IRS's collection activity began), and the IRS denied the requested relief. P petitioned this Court for relief, and by the time of trial she was disabled as a result of complications from surgery. This case would be appealed to the U.S. Court of Appeals for the Eighth Circuit. *Held*: We will follow our holding in *Lantz v. Commissioner*, 132 T.C. 131 (2009), revd. 607 F.3d 479 (7th Cir. 2010)—i.e., that the 2-year deadline imposed by 26 C.F.R. sec. 1.6015–5(b)(1), Income Tax Regs., is invalid—notwithstanding the contrary decisions by the U.S. Courts of Appeals for the Seventh Circuit in *Lantz* and for the Third Circuit in *Mannella v. Commissioner*, 631 F.3d 115 (3d Cir. 2011), revg. 132 T.C. 196 (2009). *Held*, *further*, P is entitled to relief from joint and several liability under I.R.C. sec. 6015(f).

432

*Kathryn J. Sedo*, for petitioner.
*Lisa R. Woods*, for respondent.

GUSTAFSON, *Judge*: Petitioner Suzanne Pullins requested section 6015 "innocent spouse" relief from joint liability for income taxes for tax years 1999, 2002, and 2003.[1] The Internal Revenue Service (IRS) denied Ms. Pullins's request because she did not request relief within two years of the IRS's first collection activity against her. The IRS then reevaluated Ms. Pullins's request on the merits and again determined that she was not entitled to relief. Ms. Pullins petitioned this Court, and the issue for decision is whether she is entitled to relief from joint liability under section 6015. We hold that she is.

FINDINGS OF FACT

At the time she filed the petition, Ms. Pullins lived in Minnesota.

*Ms. Pullins's marriage and finances*

Ms. Pullins completed high school. She and Curtis Shirek married in 1984. Both Mr. Shirek and Ms. Pullins wrote checks from their joint bank account to pay family bills. However, Mr. Shirek dominated the relationship, made the decisions for the family, and determined when any bills would be paid.

For each year in issue, Mr. Shirek worked in construction. Ms. Pullins was not involved in Mr. Shirek's construction activity. Some or all of Mr. Shirek's earnings were reported on Forms 1099–MISC, Miscellaneous Income. Mr. Shirek did not make quarterly prepayments of income tax.

In 1999 Ms. Pullins did not work outside the home, but in 2002 and 2003 she performed secretarial work because her family needed the income. Ms. Pullins earned wages of $19,902 in 2002 and $13,055 in 2003, and her employer withheld from her wages Federal income tax of $937 in 2002 and $550 in 2003. Ms. Pullins's income tax was underwithheld in

---

[1] Unless otherwise indicated, all citations of sections refer to the Internal Revenue Code of 1986 (26 U.S.C.), as amended.

2002 by $719, as she acknowledges,[2] and it was overwithheld in 2003 by $22.[3]

*The tax returns and assessments at issue*

For all three years at issue, Mr. Shirek employed a return preparer to prepare the couple's joint Federal income tax returns. Ms. Pullins's wage income was reported on the 2002 and 2003 returns.

In general, Mr. Shirek's construction income was reported on Schedules C, Profit or Loss From Business, attached to their returns. Mr. Shirek reported net income from his construction activity of $58,760 for 1999, $85,333 for 2002, and $51,624 for 2003. He also earned and reported $961 in wages in 1999. However, for 1999 he omitted $10,374 in income that was reported on a Form 1099–MISC.

Ms. Pullins signed each of the returns, but she did not review the returns or question Mr. Shirek about any items on the returns or any documents used to prepare the returns. She did not sign the returns under duress. When Ms. Pullins signed the 1999 return, she did not know about the omission of Mr. Shirek's income.

Ms. Pullins and Mr. Shirek filed joint Federal income tax returns for the years in issue as follows:

| Year | Date filed | Balance due [1] | Payment made with return |
|------|-----------|-----------------|--------------------------|
| 1999 | Oct. 18, 2000 | $12,823 | $150 |
| 2002 | Oct. 12, 2004 | 25,811 | -0- |

[2] Ms. Pullins computes her individual liability by using married-filing-separately status and using the standard deduction. Respondent has not disputed her arithmetic but uses a different method: Respondent takes the liability for those years as reported (i.e., using married filing jointly status) and allocates that liability between the spouses according to the amount of the income attributable to each. On that basis respondent computes that Ms. Pullins's income tax was underwithheld in both years—i.e., by $3,395 in 2002 and $940 in 2003. Ms. Pullins has not disputed respondent's arithmetic but disagrees with his method. Our use of Ms. Pullins's method is explained below in part II.C.1.a.

[3] Ms. Pullins's income tax on her wages was overwithheld by $22 in 2003. On her administrative request for relief submitted in April 2008 she requested a refund for this year, which would be made (if at all) from the only payment shown on the 2003 transcript in the record—i.e., withheld tax deemed paid in April 2004. However, even if we otherwise had authority to determine an overpayment, Ms. Pullins's request was submitted too late for her to obtain such relief. Under section 6511(a), a refund claim must be filed "within 3 years from the time the return was filed" (i.e., within three years after October 2004) or "within * * * 2 years from the time the tax was paid" (i.e., within two years after April 2004). The April 2008 request for relief was too late by either of these measures.

| Year | Date filed | Balance due [1] | *Payment made with return* |
|------|-----------|-----------------|----------------------------|
| 2003 | Oct. 12, 2004 | 13,188 | -0- |

[1] The balance due reflects the amount that Ms. Pullins and Mr. Shirek reported as owed on their returns after accounting for withholding and estimated tax payments.

The IRS assessed the tax due for 1999 (as reported on the return) in December 2000 and imposed an addition to tax for failure to timely pay the tax due. The IRS eventually learned about the missing income and in August 2002 assessed $3,430 of additional tax attributable to it.

### The IRS's collection efforts

On November 1, 2000 (before the assessment of the additional tax), Mr. Shirek and Ms. Pullins entered into an installment agreement to pay the 1999 tax liability. In 2000 and 2001 Ms. Pullins wrote checks on the joint bank account as payments toward the 1999 liability. The IRS applied refunds from tax years 2000 and 2001 toward the 1999 liability. In November 2003 the IRS terminated the installment agreement after Mr. Shirek and Ms. Pullins defaulted on the agreement. On November 15, 2003, the IRS sent notices of intent to levy to each of Ms. Pullins and Mr. Shirek for tax year 1999.

On November 29, 2004, after receiving the untimely returns for 2002 and 2003, the IRS assessed the amounts reported as tax due and imposed additions to tax for failure to timely pay and for late filing. [4] On April 5 and 7, 2005 (after Ms. Pullins filed for divorce, as discussed below), the IRS sent notices of intent to levy to both Ms. Pullins and Mr. Shirek for tax years 2002 and 2003.

### The dissolution of the marriage

Ms. Pullins and Mr. Shirek separated in late 2004, and Mr. Shirek moved out of the family home in December 2004—i.e., after they had filed their 2002 and 2003 returns. Ms. Pullins filed for divorce in February 2005. While the

[4] The IRS did not impose a late filing addition to tax for 1999, apparently because it considered the 1999 return timely filed on extension. The due dates, on extension, for 2002 and 2003 were October 15, 2003, and August 15, 2004, respectively. The October 12, 2004, filing date was well after those due dates.

divorce was pending, Ms. Pullins and Mr. Shirek sold the family home. The California State court granted Ms. Pullins the divorce in September 2005 and held that Mr. Shirek was responsible for paying the 1999, 2002, and 2003 tax debts. The divorce judgment awarded each spouse $125,227 from the sale of the marital home and also awarded each spouse certain items of property.

*Finances, remarriage, and tax compliance in subsequent years*

Ms. Pullins earned $23,634 in 2004 and $18,216 in 2005. Her tax returns for those years were due after she filed for divorce; but she did not timely file tax returns for those years, and the record does not reflect when or whether she filed a return for 2006.

For her 2007 return, Ms. Pullins submitted a $25 payment when she requested an extension of time to file (around the time that she requested innocent spouse relief for 1999, 2002, and 2003). She received an extension for her 2007 return until October 15, 2008. Ms. Pullins filed the 2007 return on October 22, 2008, reporting total tax of $2,485, withholding credits of $2,082, and tax due of $403. She paid $25 toward that liability when she filed the return. The IRS assessed the tax shown and imposed a failure-to-timely-pay addition to tax. Ms. Pullins made additional payments in 2009 toward her 2007 liability.

Ms. Pullins remarried in 2007. She stopped working in October 2008 and as a result of complications from surgery is now disabled. At the time of trial she was receiving monthly long-term disability insurance payments of $1,700. Shortly before trial she qualified for monthly Social Security disability benefits of $791. Those benefits will reduce her insurance payment, and she expects her total monthly disability income to be $2,091 while the insurance payments continue. Ms. Pullins expects her disability to be permanent, and this expectation is reasonable.

*Request for relief*

On April 22, 2008, Ms. Pullins filed a Form 8857, Request for Innocent Spouse Relief, with the IRS to request relief under section 6015. On the Form 8857 she did not indicate

that she had been abused, and she did not allege any mental or physical health problems.

Ms. Pullins submitted her request roughly four and a half years after the IRS issued the November 2003 levy notice for tax year 1999 and slightly more than three years after the April 2005 levy notices for tax years 2002 and 2003.

## OPINION

### I. *Joint and several liability and section 6015 relief generally*

Section 6013(d)(3) provides that when taxpayers file a joint return, the tax is computed on their aggregate income, and their liability to pay the tax shown on the return or found to be owing is joint and several. See also 26 C.F.R. sec. 1.6013–4(b), Income Tax Regs. That is, each spouse is liable for the entire joint tax liability.

Section 6015 provides three types of relief from joint and several liability: (1) full or apportioned relief under section 6015(b); (2) proportionate relief for divorced or separated taxpayers under section 6015(c); and (3) equitable relief under section 6015(f) when relief is unavailable under either section 6015(b) or (c).

Subsections (b) and (c) both include explicit time limits for requesting relief. Absent a request's being submitted within two years of the first collection action against the requesting taxpayer, the statute bars relief under either subsection. Sec. 6015(b)(1)(E), (c)(3)(B). Ms. Pullins requested relief under section 6015 more than two years after the IRS began collection action against her. Therefore she is not entitled to relief under subsection (b) or (c).[5]

In section 6015(f) Congress did not impose a time limit for requesting relief. However, by regulation the IRS purported to impose a two-year time limit. See 26 C.F.R. sec. 1.6015–

---

[5] The tax returns in issue all report tax due, but Ms. Pullins and Mr. Shirek did not pay the tax with the returns. Thus, they had underpayments for each year in issue. Pursuant to section 6015(b)(1)(B), relief under section 6015(b) is available only for an "understatement", not an underpayment; and pursuant to section 6015(c)(1), relief under section 6015(c) is available only for a "deficiency", not an underpayment. See *Washington v. Commissioner*, 120 T.C. 137, 146–147 (2003). Section 6015(f) is broader and permits relief from "any unpaid tax or any deficiency (or any portion of either)". Thus, even if she had requested relief within two years, Ms. Pullins's only possible avenue for relief for the underpayments is under section 6015(f). See *Hopkins v. Commissioner*, 121 T.C. 73, 88 (2003). For 1999 Mr. Shirek omitted $10,374 of income, and that omission results in an understatement of tax. Although section 6015(b) and (c) may provide relief from understatements, due to the late request for relief, only section 6015(f) may provide relief in this case, even for the liability resulting from this unreported income.

5(b)(1). As is discussed briefly below, we have held that regulation to be invalid.

II. *Equitable relief under section 6015(f)*

  A. *Statutory text*

Section 6015(f) provides:

SEC. 6015(f). EQUITABLE RELIEF.—Under procedures prescribed by the Secretary, if—

    (1) taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either); and

    (2) relief is not available to such individual under subsection (b) or (c),

the Secretary may relieve such individual of such liability.

Thus, section 6015(f) may offer relief from joint and several liability, provided that the taxpayer shows that it is inequitable to hold her liable upon consideration of all the facts and circumstances.

  B. *Procedure and burden of proof*

Congress provided this Court express authority to review the IRS's denial of equitable relief under section 6015(f), granting jurisdiction "to determine the appropriate relief available to the individual under this section". Sec. 6015(e)(1). We conduct a trial de novo when determining whether a taxpayer is entitled to relief under section 6015(f), and we may consider evidence outside the administrative record. *Porter v. Commissioner* (*Porter I*), 130 T.C. 115, 117 (2008). We employ a de novo standard of review, rather than reviewing for abuse of discretion; and the requesting spouse bears the burden of proving that she is entitled to equitable relief under section 6015(f). *Porter v. Commissioner* (*Porter II*), 132 T.C. 203, 210 (2009).

  C. *Factors for evaluating equitable relief: Revenue Procedure 2003–61*

In accord with the statutory provision that relief is to be granted under section 6015(f) following "procedures prescribed by the Secretary," the IRS has issued revenue procedures to guide its employees in determining whether a taxpayer is entitled to relief from joint and several liability. See

Rev. Proc. 2003–61, 2003–2 C.B. 296, modifying and superseding Rev. Proc. 2000–15, 2000–1 C.B. 447. Revenue Procedure 2003–61, *supra*, lists the factors that IRS employees should consider, and the Court consults those same factors when reviewing the IRS's denial of relief. See *Washington v. Commissioner*, 120 T.C. 137, 147–152 (2003).

Revenue Procedure 2003–61, *supra*, provides a three-step analysis for IRS personnel to follow in evaluating requests for relief: Section 4.01 lists seven threshold conditions that must be met before the IRS will grant any relief; section 4.02 lists circumstances in which the IRS will ordinarily grant relief as to liabilities that were reported on a return (the underpayments at issue in this case); and section 4.03 sets out eight non-exclusive factors that the IRS will consider in determining whether equitable relief should be granted. See Rev. Proc. 2003–61, 2003–2 C.B. at 297–298.

1. *Section 4.01: Threshold conditions*

The threshold conditions of section 4.01 of Revenue Procedure 2003–61 are:

(1) The requesting spouse filed a joint return for the taxable year for which he or she seeks relief.

(2) Relief is not available to the requesting spouse under section 6015(b) or (c).

(3) The requesting spouse applies for relief no later than two years after the date of the Service's first collection activity after July 22, 1998, with respect to the requesting spouse. * * * [6]

(4) No assets were transferred between the spouses as part of a fraudulent scheme by the spouses.

(5) The nonrequesting spouse did not transfer disqualified assets to the requesting spouse. * * *

(6) The requesting spouse did not file or fail to file the return with fraudulent intent.

(7) The income tax liability from which the requesting spouse seeks relief is attributable to an item of the individual with whom the requesting spouse filed the joint return * * * [absent certain enumerated exceptions.]

The IRS admits that, in large part, Ms. Pullins satisfies these requirements: She filed joint returns for the years in issue; she is not eligible for relief under section 6015(b) or (c); there is no evidence of fraudulent asset transfers; there is no evidence of disqualified asset transfers; Ms. Pullins did not

---

[6] See part II.C.1.b below, discussing the two-year requirement.

file the returns with any fraudulent intent; and considering that Ms. Pullins did not work in 1999 and that Mr. Shirek's income dwarfed Ms. Pullins's income in 2002 and 2003, it is clear that most of the underpayments result from omissions of Mr. Shirek's construction income. Thus, Ms. Pullins has largely satisfied the threshold conditions of section 4.01 of Revenue Procedure 2003–61. Two exceptions merit discussion:

a. *Tax attributable to Ms. Pullins*

The exception to her satisfaction of these conditions is her 2002 underwithholding of $719; and to the extent of that underwithholding, she did not meet the seventh threshold condition and we do not grant relief. As we stated above, for purposes of determining the extent of her liability for or overpayment of tax on her own income, we use Ms. Pullins's computation on the basis of married-filing-separately status, rather than the IRS's computation that made a pro rata allocation of the reported liability (based on married-filing-jointly status). To reckon the amount of tax liability that Ms. Pullins *should* have to pay because it is fairly attributable to her, we think that on the facts of this case it is reasonable to figure Ms. Pullins's tax liability separately. The IRS's method assumes a joint liability and then attributes to her a pro rata share of the joint liability, but the purpose of section 6015 is to grant *relief from* joint liability. Under the IRS's method, if we found Ms. Pullins to be otherwise entitled to section 6015 relief, we would nonetheless leave her liable for a portion of the joint liability.[7] Our aim here, however, is to figure Ms. Pullins's own liability apart from joint liability and then ensure that we do not excuse her from paying her own liability. To accomplish that aim, a determination of her separate liability,[8] rather than an allocation of the joint liability, is most reasonable here.

---

[7] For example, the joint liabilities include self-employment tax on Mr. Shirek's construction income, which tax accounts for 45 percent of the joint Federal income tax the IRS assessed for 2002. The IRS's pro rata approach would allocate a proportionate share of that self-employment tax to Ms. Pullins, even though the self-employment tax is calculated on Mr. Shirek's income alone, see 26 C.F.R. sec. 1.6017–1(b)(1), and became Ms. Pullins's liability only because she filed jointly with Mr. Shirek, see 26 C.F.R. sec. 1.6017–1(b)(2).

[8] As an analogy, see 26 C.F.R. sec. 1.6013–4(d) (to allocate liability where a supposedly joint return was signed under duress, "The return is adjusted to reflect only the tax liability of the individual who voluntarily signed the return, and the liability is determined at the applicable rates in section 1(d) *for married individuals filing separate returns*" (emphasis added)).

b. *Requesting relief more than two years after the IRS's first collection activity*

The third threshold condition of section 4.01 of Revenue Procedure 2003–61 states a deadline that the IRS promulgated by regulation in 26 C.F.R. section 1.6015–5(b)(1). That regulation purports to impose a two-year deadline on requests for relief under section 6015(f), and Ms. Pullins did not meet that deadline. [9] In *Lantz v. Commissioner*, 132 T.C. 131 (2009), revd. 607 F.3d 479 (7th Cir. 2010), we held that the two-year deadline imposed by the regulation is an invalid interpretation of section 6015(f). After the U.S. Court of Appeals for the Seventh Circuit reversed *Lantz*, we reconsidered the matter but did not change our position. See *Hall v. Commissioner*, 135 T.C. 374 (2010). The U.S. Court of Appeals for the Third Circuit has recently held the two-year deadline to be valid, see *Mannella v. Commissioner*, 631 F.3d 115 (3d Cir. 2011), revg. 132 T.C. 196 (2009), but for the reasons we have previously expressed, we respectfully disagree. The court to which an appeal would lie in this case—the Court of Appeals for the Eighth Circuit—has not addressed this issue, and we therefore follow our holding in *Lantz* and treat the IRS's two-year deadline as invalid.

In *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. ____, ____, 131 S. Ct. 704, 713 (2011), the Supreme Court recently clarified that the standard by which the validity of regulations will be measured—with regard to tax matters as well as other matters, and with regard to "general authority" regulations as well as "specific grant of authority" regulations—is the two-step standard of *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

However, *Mayo* prompts no reconsideration of our holding in *Lantz* that the regulation at issue here is invalid. When

[9] Ms. Pullins explained that she did not request relief because she thought she did not need it, since the State court had ordered her husband to pay the taxes. Although given an opportunity to do so at trial, the IRS made no contention that it suffered any prejudice as a result of the timing of her request or that Ms. Pullins was culpable for her delay in submitting her request more than two years after the collection notices. Given our position on the invalidity of the regulation's two-year deadline, Ms. Pullins did not contend that, and we therefore do not address whether, the regulation's two-year deadline is subject to equitable tolling. Cf. *Mannella v. Commissioner*, 631 F.3d 115 (3d Cir. 2011) (remanding to consider whether equitable tolling applies), revg. 132 T.C. 196 (2009); *Hall v. Commissioner*, 135 T.C. 374, 387 n.5 (2010) (Wells, J., concurring) ("such a period of limitations would be subject to the 'doctrine' of equitable tolling").

we decided *Lantz*, we used the now-mandated *Chevron* standard:

Following *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we apply the law of the Court of Appeals to which an appeal in the case would normally lie. Section 1.6015–5, Income Tax Regs., was issued under both a general grant of authority under section 7805 and a specific grant of authority under section 6015(h). T.D. 9003, 2002–2 C.B. 294. The U.S. Court of Appeals for the Seventh Circuit has held that regulations issued under general or specific authority of the IRS to promulgate necessary rules are entitled to *Chevron* deference. * * * Accordingly, we will follow the *Chevron* standard in this analysis. [*Lantz v. Commissioner*, *supra* at 137; fn. ref. omitted.]

Thus, in *Lantz* we held the two-year deadline invalid under the *Chevron* standard, and consequently we follow *Lantz* (and *Mayo* and *Chevron*) today.

2. *Section 4.02: Circumstances ordinarily allowing relief*

Section 4.02 of Revenue Procedure 2003–61 provides three conditions that, if satisfied, will ordinarily qualify a requesting spouse for relief by the IRS from liability for an underpayment of a properly reported liability. The conditions are:

(a) On the date of the request for relief, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse, or has not been a member of the same household as the nonrequesting spouse at any time during the 12-month period ending on the date of the request for relief.

(b) On the date the requesting spouse signed the joint return, the requesting spouse had no knowledge or reason to know that the nonrequesting spouse would not pay the income tax liability. The requesting spouse must establish that it was reasonable for the requesting spouse to believe that the nonrequesting spouse would pay the reported income tax liability. * * *

(c) The requesting spouse will suffer economic hardship if the Service does not grant relief. For purposes of this revenue procedure, the Service will base its determination of whether the requesting spouse will suffer economic hardship on rules similar to those provided in Treas. Reg. § 301.6343–1(b)(4). * * *

[Rev. Proc. 2003–61, sec. 4.02(1), 2003–2 C.B. at 298.]

Ms. Pullins meets only one of these three conditions, as we now show.

a. *Married, separated, or divorced*

Mr. Shirek moved out in December 2004, and he and Ms. Pullins were divorced in 2005. She filed her request for relief in 2008. Ms. Pullins clearly satisfies the first condition.

b. *Knowledge or reason to know*

Ms. Pullins argues that she did not know of the unpaid liabilities when the returns were filed in October 2000 and October 2004—first because she had no knowledge of any unpaid tax liability on the returns and second because she reasonably believed that Mr. Shirek would pay any taxes due. Neither of these arguments is persuasive.

(1) *Knowledge of the liabilities*

As to her alleged ignorance of the liabilities, Ms. Pullins testified that she did not notice the amounts of tax shown as due on the returns (but not paid with the returns) when she signed them; and she claims that she was unaware that any amount of tax was due. She explained that she was ignorant of any tax liability until she filed for divorce in February 2005.

However, Ms. Pullins did not explain why she wrote checks to the IRS from the couple's bank account in 2000 and 2001—with memo lines specifically referring to tax year 1999—to make partial payments toward the 1999 tax liability if she did not know that she and her husband had a problem with unpaid taxes. Her joining Mr. Shirek in entering into an installment agreement in November 2000 further demonstrates her awareness of their outstanding liabilities. On these facts, we find her contention that she did not know about the couple's tax liabilities until she filed for divorce in 2005 is not credible.

Ms. Pullins asserted that she signed the returns without reviewing them because she trusted Mr. Shirek. We recognize that many taxpayers trust their spouse to prepare and file their tax returns and pay their taxes, but we note that

The rate of tax applied against a given amount of income generally is lower when the income is reported on a joint return than when a husband and wife file separate returns. The price which the law exacts for this privilege is that taxpayers who file a joint return are jointly and severally liable for the amount of tax due, *see* 26 U.S.C. § 6013(d)(3) (1982), regard-

less of the source of income reported and notwithstanding the fact that one spouse may be less informed about the contents of the return. *See Sonnenborn v. Commissioner*, 57 T.C. 373, 381 (1971); 26 U.S.C. § 6013(d)(3) (1982). [*Stevens v. Commissioner*, 872 F.2d 1499, 1503 (11th Cir. 1989), affg. T.C. Memo. 1988–63.]

A taxpayer may not obtain the benefits of joint filing status but then obtain relief from joint and several liability by ignoring or avoiding facts fully disclosed on a return she signed. *Hayman v. Commissioner*, 992 F.2d 1256, 1262 (2d Cir. 1993) (taxpayer who claims to have signed returns without reading them is nevertheless charged with constructive knowledge of their contents), affg. T.C. Memo. 1992–228. We impute to a taxpayer knowledge of what she could have gleaned from the tax returns she signed, if she had taken the time to review them. *Porter v. Commissioner*, 132 T.C. at 211–212. Accordingly, Ms. Pullins is chargeable with knowledge of the liabilities that were reported on the returns she signed.[10]

(2) *Knowledge that her husband would not pay the liabilities*

In evaluating whether a requesting spouse knew or had reason to know her nonrequesting spouse would not pay the tax liability, the IRS considers the level of education attained by the requesting spouse, any evasiveness or deceit by the nonrequesting spouse, how involved the requesting spouse was in the activity generating the income tax liability, the requesting spouse's involvement in financial matters of the household, her business or financial expertise, and any lavish or unusual expenditures compared to past spending levels. Rev. Proc. 2003–61, sec. 4.03(2)(a)(iii)(C), 2003–2 C.B. at 298.

There is no evidence of lavish or increased spending in 1999, and by 2002 the family finances were sufficiently tight that Ms. Pullins had started working to help make ends meet. Ms. Pullins had access to the couple's joint checking account, but she explained that Mr. Shirek controlled the finances and made the decisions for the family. Ms. Pullins

---

[10] The foregoing discussion addresses only the liabilities that were actually reported on the returns that Ms. Pullins signed—i.e., the great bulk of the liabilities. For purposes of the analysis under Rev. Proc. 2003–61, sec. 4.02(1)(b), 2003–2 C.B. 296, 298, that discussion is adequate. As to the $3,430 of tax for 1999 that is attributable to the construction income that Mr. Shirek omitted from the return, see *infra* pt. II.C.3.a.(3).

was not involved in Mr. Shirek's construction activity, which generated most of the income for the family. There is no evidence of deceit in the record, but Ms. Pullins did allege in a statement attached to her request for relief that she had filed for divorce when she learned that Mr. Shirek was keeping money from her. Ms. Pullins completed high school and does not claim sophisticated business or financial knowledge or expertise.

Ms. Pullins testified that she never had reason to question Mr. Shirek about payment of taxes. However, she made payments toward the 1999 liabilities and entered into the installment agreement, and by 2002 they needed more income and she had to start working to help support the family; so it is clear that she was aware of their financial problems. The question is whether the requesting spouse knew the taxes would be paid on time or reasonably promptly after the returns were filed. *Schepers v. Commissioner*, T.C. Memo. 2010–80. The partial payment submitted with the 1999 return and the subsequent installment agreement demonstrate slow and perhaps reluctant payment—of which Ms. Pullins was fully aware. The application of refunds from the couple's 2000 and 2001 returns toward the 1999 liability provided her further information about Mr. Shirek's tax payments. We do not find that when she signed the returns she reasonably believed that Mr. Shirek would promptly pay the liabilities shown on the returns.

The California court that granted Ms. Pullins's divorce from Mr. Shirek allocated the outstanding tax liabilities to Mr. Shirek. The court also ordered the couple to split the $250,454 gain from the sale of their marital home. Thus, Mr. Shirek had the means to pay the 1999, 2002, and 2003 Federal income tax liabilities in September 2005 when the court filed the judgment of dissolution and awarded him $125,227 of the proceeds from the sale of the home. Accordingly, when the court issued the divorce decree, it was reasonable for Ms. Pullins to expect Mr. Shirek to obey the court and pay the tax debts. However, it is her knowledge or reason to know at the time she signed the tax returns that is critical to this inquiry; and under the circumstances she had reason to doubt, when she signed the returns, that Mr. Shirek would pay the liabilities.

c. *Economic hardship*

The IRS evaluates a requesting spouse's claim of economic hardship by considering any information offered by the individual that is relevant to the determination, including her income, assets and liabilities, age, ability to earn, responsibility for dependents, the amounts reasonably necessary for basic living expenses, the allowable living expenses for her geographic area, and other factors. See *Wiener v. Commissioner*, T.C. Memo. 2008–230; 26 C.F.R. sec. 301.6343–1(b)(4)(ii), Proced. & Admin. Regs. (incorporated into Rev. Proc. 2003–61 by its sec. 4.02(1)(c)). It is clear that Ms. Pullins is disabled. At trial Ms. Pullins was manifestly in pain, short of breath, and uncomfortable sitting or standing for long periods. Her disability plainly compromises her ability to earn and is properly taken into account in determining whether she faces economic hardship. However, her disability is not the only factor to be considered, and two other considerations prevent the conclusion that she has established economic hardship:

(1) *Economic facts at the time of trial*

Ms. Pullins testified that she receives long-term disability insurance payments (which may terminate on some unspecified future date), that she expected she would soon begin receiving Social Security disability benefit payments, that her monthly disability income would be $2,091, and that she expects her disability to be permanent. She further testified that she has commenced divorce proceedings against her second husband and expected to move out of his house when her Social Security disability benefit payments commence. She argues that, when she is on her own, her disability payments will be insufficient to cover her expenses.

A hypothetical hardship is insufficient to justify relief; a taxpayer must demonstrate that imposing joint and several liability is "inequitable in present terms", *Von Kalinowski v. Commissioner*, T.C. Memo. 2001–21, and poses a present economic hardship. When evaluating economic hardship, the Office of Appeals necessarily views the requesting spouse's financial situation as of the hearing date; but we properly consider the evidence presented at the de novo trial, see *Porter I*, and we consequently evaluate her financial situa-

tion and prospects as of that time, see *Nihiser v. Commissioner*, T.C. Memo. 2008–135, 95 T.C.M. (CCH) 1531, 1538 (2008) ("we should * * * look at the evidence presented at trial, and the state of her finances at that time. * * * But we must also consider * * * [petitioner's] future ability to earn her current salary and pay her basic living expenses").

As of the date of trial, Ms. Pullins continued to live with Mr. Pullins—her second husband—and he apparently paid her expenses. While her disability payments are admittedly modest, as long as she and Mr. Pullins continue to live together—i.e., on the facts at the time of trial—their household apparently has a monthly budget surplus and some ability to pay the tax debt. Moreover, Ms. Pullins did not introduce any evidence of what her expenses might be if she moves from the home she has shared with Mr. Pullins. Thus, she presented virtually no detail to substantiate her claim of economic hardship, whether in her current circumstance with her husband *or* in an anticipated future on her own.

#### (2) *Assets on hand*

Ms. Pullins did not offer any evidence at trial[11] to show whether she had any assets.[12] This evidentiary gap is especially significant because in 2005 she received $125,227 of the proceeds of the sale of her previous marital home. She testified that she used part of those proceeds for living expenses, to purchase a car, and to relocate from California to Minnesota. However, she did not state whether she still had any of those funds as of the date of trial.

Ms. Pullins has the burden of proof, and on this record she has not proved that she will suffer economic hardship if relief is not granted.

---

[11] Similarly, when Ms. Pullins submitted her request for relief to the IRS in April 2008, she did not show her assets. The reason for that omission may be that the then-current version of Form 8857, Request for Innocent Spouse Relief, as revised in June 2007, did not specifically require disclosure of a requesting spouse's assets. The subsequent version of Form 8857 as revised in September 2010 includes an additional section that asks: "Tell us about your assets. Your assets are your money and property. Property includes real estate, motor vehicles, stocks, bonds, and other property that you own. Tell us the amount of cash you have on hand and in your bank accounts. Also give a description of each item of property, the fair market value of each item, and the balance of any outstanding loans you used to acquire each item."

[12] When a taxpayer fails to produce evidence in her possession which, if true, would be favorable, we may presume that the evidence, if produced, would favor the opposing party. *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

### 3. *Alternative facts-and-circumstances test*

Where, as here, the requesting spouse satisfies the threshold conditions of Revenue Procedure 2003–61, section 4.01, but fails to qualify for relief under section 4.02, she may nevertheless obtain relief under the facts and circumstances test of section 4.03. The IRS considers a nonexclusive list of factors to determine whether "taking into account all the facts and circumstances, it is inequitable to hold the requesting spouse liable": (1) whether the requesting spouse is separated or divorced from the nonrequesting spouse; (2) whether the requesting spouse would suffer economic hardship if not granted relief; (3) whether, in the case of an underpayment, the requesting spouse knew or had reason to know that the other spouse would not pay the liability, and, in the case of a deficiency, whether the requesting spouse did not know and had no reason to know of the item giving rise to the deficiency; (4) whether the nonrequesting spouse had a legal obligation to pay the outstanding tax liability pursuant to a divorce decree or agreement; (5) whether the requesting spouse received a significant benefit from the unpaid income tax liability or the item giving rise to the deficiency; and (6) whether the requesting spouse has made a good faith effort to comply with the tax laws for the taxable years following the years for which she requests relief. *Id.* sec. 4.03(2), 2003–2 C.B. at 298–299.

Other factors that may indicate relief is appropriate when present but that will not weigh against granting relief when absent are: (i) whether the nonrequesting spouse abused the requesting spouse and (ii) whether the requesting spouse was in poor mental or physical health at the time she signed the tax return or when she requested relief. *Id.* sec. 4.03(2)(b), 2003–2 C.B. at 299.

We analyze all relevant facts and circumstances, with all factors considered and appropriately weighted and no single factor determinative, in determining whether it is inequitable to hold a taxpayer liable for a joint tax liability. See *Porter II*, 132 T.C. at 214.

a. *Applying the facts and circumstances factors*

(1) *Marital status*

Ms. Pullins had divorced Mr. Shirek when she requested innocent spouse relief. This factor weighs in favor of relief.

(2) *Economic hardship*

Generally, economic hardship exists when collection of the tax liability will render the taxpayer unable to meet basic living expenses. 26 C.F.R. sec. 301.6343–1(b)(4)(i). As discussed above in part II.C.2.c., Ms. Pullins failed to make a convincing showing of economic hardship. She failed to make an accounting of her assets, and it appears that as long as she lives with her second husband, she has some income available to pay toward her tax liability; consequently, she has not proved economic hardship. However, Ms. Pullins is disabled, and the marriage on which her support currently depends was, at the time of the trial, evidently at risk of dissolution. Balancing her inability to work and the modest disability income she will receive against the lack of evidence on assets and expenses, we find this factor to weigh only moderately against granting relief.

(3) *Knowledge or reason to know*

Ms. Pullins actually knew about (or is imputed with knowledge about) the liabilities reported on the returns she signed, and she did not have a reasonable belief that Mr. Shirek would reasonably promptly pay those liabilities. See *supra* pt. II.C.2.b.

However, in the case of a deficiency, the question is whether the requesting spouse did not know and had no reason to know of the item giving rise to the deficiency—in this case, the $10,374 of construction income that Mr. Shirek omitted in 1999 (which generated an additional tax liability of $3,430). Ms. Pullins did not know of that omission and, given her non-involvement in his construction business, she could not reasonably be expected to have known. This was not an instance in which a husband failed altogether to report income from a business that his wife knew about; rather, here the husband reported about 85 percent of the income. As to the unreported portion of the liability (i.e., the

deficiency), Ms. Pullins lacked knowledge, and to the extent of $3,430 of the joint liability this factor weighs in favor of granting relief.

As to the underpayments, however, as noted Ms. Pullins has not proved that she did not know and had no reason to know, when she signed the returns at issue, that Mr. Shirek would not pay the tax liabilities reflected there. For most of the liability, therefore, this factor weighs against granting relief.

(4) *Nonrequesting spouse's legal obligation*

The California court's August 2005 judgment ordered Mr. Shirek to pay the 1999, 2002, and 2003 Federal income tax and California Franchise Tax Board liabilities, and it also ordered him to appear on behalf of Ms. Pullins, defend her, and hold her harmless from those debts. Moreover, Mr. Shirek had the means to pay the Federal income taxes after the divorce, given that the property distribution awarded $125,227 to each spouse from the sale of the marital residence. We are not bound (by collateral estoppel or otherwise) to the determination of a State family court, and that court does not have the power to adjust a spouse's Federal tax liabilities. However, when evaluating what is equitable in this instance under section 6015(f), we will assign considerable weight to the determination of the State court which placed the responsibility for satisfying the tax debts on Mr. Shirek.

Revenue Procedure 2003–61, sec. 4.03(2)(a)(iv), 2003–2 C.B. at 298, provides that the nonrequesting spouse's legal obligation "will not weigh in favor of relief if the requesting spouse knew or had reason to know, when entering into the divorce decree or agreement, that the nonrequesting spouse would not pay the income tax liability." Considering the circumstances that existed at the time of the divorce (as opposed to the time she signed the returns, see *supra* part II.C.2.b.), the record does not contain any evidence indicating that Ms. Pullins had any reason to expect that Mr. Shirek would ignore the family court order and fail to pay the tax debts. Accordingly, this factor clearly weighs in favor of granting Ms. Pullins relief.

(5) *Significant benefit*

The significant benefit factor examines whether the requesting spouse directly or indirectly received "significant benefit (beyond normal support) from the unpaid income tax liability". Rev. Proc. 2003–61, sec. 4.03(2)(a)(v), 2003–2 C.B. at 299 (referencing 26 C.F.R. section 1.6015–2(d)). Ms. Pullins did share in the benefit of Mr. Shirek's income for the years in issue; but there is nothing in the record to indicate that, during her marriage to Mr. Shirek, Ms. Pullins received any specific or extraordinary benefit from their nonpayment of their tax liabilities. The IRS points to their acquisition of "waverunners, a golf cart and a camper/trailer"; but while it is certainly true that a family should not buy such items rather than pay their taxes, we think these items do not rise to a level that implicates significant benefit to Ms. Pullins.

More difficult to evaluate is the IRS's contention that Ms. Pullins benefited from the nonpayment of taxes by her receipt of increased proceeds from the equity in the marital home. The IRS observes:

Upon her divorce from Mr. Shirek, Petitioner received $125,000.00 from the sale of the marital home. * * * Had Petitioner and Mr. Shirek used the equity of $250,000 in their home to pay their tax liabilities at the time they were due, the money Petitioner would have received from the sale of the marital home would have been significantly less. See *George v. Commissioner*, T.C. Memo. 2004–261. In *George*, the Court found that the requesting spouse received a significant benefit when she received pension and life insurance funds after the death of the nonrequesting spouse. The Court noted these funds could have been used during the nonrequesting spouse's lifetime to pay the tax liabilities and the requesting spouse would have received a reduced amount of money. Consequently, the requesting spouse received a significant benefit from the nonpayment of the taxes. *Id.* Likewise, Petitioner would have received far less money during her divorce had the tax liabilities been paid when due.

It is true that the proceeds to be distributed to the spouses in the divorce proceedings would have been reduced if the couple had used the equity in the marital home to pay their tax debts. However, two considerations defeat the contention that this resulted in significant benefit to Ms. Pullins:

First, *George v. Commissioner,* T.C. Memo. 2004–261, involved not proceeds from the sale of a marital home but pension and life insurance funds. Unlike the funds in *George*, here the equity interest in the home was created by the fam-

ily's mortgage payments—i.e., one of its routine living expenditures. By definition, significant benefit is "beyond normal support". Rev. Proc. 2003–61, sec. 4.03(2)(a)(v). Mortgage payments on a middle-class home constitute normal support that is not considered to generate "significant benefit". It is therefore difficult to explain how, before the property distribution in the divorce, any significant benefit could arise from the equity interest that is simply the result of those mortgage payments.

Second, Ms. Pullins's first opportunity to drawn down equity from the home to pay the taxes was when the house was sold and the proceeds were distributed in the divorce proceedings. It does not appear—and we cannot assume— that nonpayment of the taxes at that time actually benefited her or (to put it differently) that payment of the taxes at the time of the distribution would have reduced her share of the distribution. The divorce court awarded Mr. Shirek half (i.e., $125,227) of the proceeds *and* ordered him to pay the taxes unilaterally; thus, the court evidently intended that Ms. Pullins receive $125,227 not reduced by tax payments. If instead Ms. Pullins and Mr. Shirek had agreed that the taxes would be paid directly from the proceeds, then on the basis of everything we know, it is altogether likely that the court would have awarded Ms. Pullins $125,227 and given Mr. Shirek only the remainder. If that is true, then Ms. Pullins did not benefit from the nonpayment of the taxes at that time but rather suffered the detriment, not intended by the divorce court, of having her share of the proceeds remain at risk of IRS collection.

Under the circumstances of this case, we find that Ms. Pullins did not realize significant benefit from the non-payment of the taxes. Accordingly, this factor weighs in favor of granting relief.

(6) *Compliance with Federal tax laws*

Where the requesting spouse has made a good-faith effort to comply with Federal tax laws in years following the years for which she requests relief, this compliance can weigh in favor of relief. Ms. Pullins testified that she mailed tax returns for tax years 2004 and 2005 with filing status of married filing separate and single, respectively. She asserted

that she mailed those returns the Saturday before trial in September 2009. As of the date of trial, the IRS had no record of receiving the returns, and Ms. Pullins offered no evidence of their filing. The record does not clearly reflect whether or when Ms. Pullins filed a Federal income tax return for 2006—or whether she had an obligation to file for 2006. She requested an extension of time to file her 2007 return, and it was due on October 15, 2008. She filed the return one week late, with a balance due, and she paid that balance, plus interest and additions to tax, by February 24, 2009.

Ms. Pullins asserts that her mailing her 2004 and 2005 Federal income tax returns the weekend before trial in September 2009 shows that she was in compliance with her tax filing obligations at the time of trial. Those returns both claim an overpayment and request a refund. However, she filed each of those returns several years after they were due and on the eve of trial. We cannot say that she has proved that she made a good-faith effort to comply with Federal income tax laws in the years following the years in issue. Accordingly, this factor weighs against granting relief.

(7) *Abuse*

At trial Ms. Pullins testified that Mr. Shirek became an abusive alcoholic at the end of their marriage. She still trusted him when they signed the 2002 and 2003 returns in October 2004, but he moved out of the family home in December 2004, and she filed for divorce in February 2005. Ms. Pullins did not inform the IRS before trial that she suffered abuse at Mr. Shirek's hands. On the contrary, in her April 2008 request for relief on Form 8857, she explicitly answered "No" to question 10: "Were you a victim of spousal abuse or domestic violence during any of the tax years you want relief?"

At trial, however, Ms. Pullins alleged that Mr. Shirek emotionally abused her during the marriage. When questioned about her "No" answer on Form 8857, she explained that she made a simple mistake and checked the wrong box. However, the following additional instructions accompany the "Yes" box:

Attach a statement to explain the situation and when it started. Provide photocopies of any documentation, such as police reports, a restraining

order, a doctor's report or letter, or a notarized statement from someone who was aware of the situation.

Ms. Pullins did not describe or document any alleged abuse in an attachment to her Form 8857; and she did not explain why, if she mistakenly checked "No", she did not follow the "Yes" instructions and do so.[13]

Ms. Pullins has not introduced any evidence to corroborate her testimony—contradicted by her Form 8857—that she suffered abuse from Mr. Shirek. Accordingly, we do not find that she proved abuse. This factor does not weigh in favor of relief—and it also does not weigh against granting relief. See Rev. Proc. 2003–61, sec. 4.03(2)(b), 2003–2 C.B. at 299.

(8) *Mental or physical health*

There is no evidence that Ms. Pullins was ill when she signed the returns in issue or when she requested relief in April of 2008. See *id.* sec. 4.03(2)(b)(ii). This factor ordinarily would not weigh in favor of or against granting relief in the IRS's analysis. See *id.* sec. 4.03(2)(b). However, having observed Ms. Pullins at trial in September 2009, we conclude that she is now disabled and unable to work and earn income and that she may be permanently so. We find that her obviously impaired health at the time of the trial de novo is relevant, and we conclude that this factor weighs in favor of granting relief.

b. *Weighing the facts and circumstances*

This is a close case. Three factors favor retained liability: Ms. Pullins's failure to prove economic hardship, her lack of a reasonable expectation that Mr. Shirek would pay the liabilities when she signed the returns, and her failure to timely file her returns and pay her taxes since the years in issue. However, four factors favor relief—Ms. Pullins's divorce from Mr. Shirek, Mr. Shirek's legal obligation to pay the tax liabilities, Ms. Pullins lack of significant benefit from the nonpayment, and Ms. Pullins's poor health—and a fifth

---

[13]Ms. Pullins explained that she did not allege abuse during her divorce proceedings because she wanted the divorce to proceed quickly so that she could get out of the marriage. This rationale may be perfectly logical for the divorce proceedings and may explain why the California family court judgment does not discuss abuse. Thus, we do not rely on that judgment to prove or disprove abuse. However, she completed Form 8857 in April 2008, long after the divorce proceedings had concluded.

favors relief as to the 1999 deficiency, i.e., her lack of knowledge of Mr. Shirek's unreported income. Especially weighty here is the fact that the divorce court—with the family's circumstances set out before it in greater detail than was possible in our tax case—determined that Mr. Shirek should pay the taxes, placed proceeds in his hands sufficient to do so, and allocated resources to Ms. Pullins on the assumption that he would do so and she would not have to.

Accordingly, after considering and weighing all the factors, we find that with the exception of her underwithholding of $719 of her own liability in 2002, it would be inequitable to hold Ms. Pullins liable for the 1999, 2002, and 2003 tax liabilities.

To reflect the foregoing,

*An appropriate decision will be entered.*