T.C. Summary Opinion 2016-43

UNITED STATES TAX COURT

MELISSA A. SIMONETTA, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24002-14S.                    Filed August 16, 2016.

Melissa A. Simonetta, pro se.

John D. Ellis, for respondent.

SUMMARY OPINION

CHIECHI, Judge: This case was heard pursuant to the provisions of section

7463 of the Internal Revenue Code in effect when the petition was filed.[1]  Pur-

_____

[1]Hereinafter, all section references are to the Internal Revenue Code in
effect at all relevant times.  All Rule references are to the Tax Court Rules of
Practice and Procedure.

suant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Petitioner filed the petition in this case in response to a so-called final appeals determination (notice of determination) concerning her request for relief under section 6015 for each of the taxable years 2008, 2009, and 2010. We must decide whether petitioner is entitled to relief under that section for each of those years. We hold that she is.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

At the time petitioner, Melissa A. Simonetta (sometimes, Ms. Simonetta), filed the petition in this case, she resided in Virginia.

From around 1990 until around the end of 2007, Ms. Simonetta worked as a salaried, full-time employee at the American Federation of State, County & Municipal Employees (AFSCME), a labor union, in Washington D.C. Around the time she ceased working for AFSCME, her salary was approximately $68,000 annually.

On September 28, 1996, Ms. Simonetta and Christopher Simonetta (Mr. Simonetta) married in Virginia. (We shall sometimes refer collectively to Ms. Simonetta and Mr. Simonetta as the Simonettas.) Ms. Simonetta and Mr. Simon-

etta were married throughout 2008, 2009, and 2010. The Simonettas have two children, both of whom had health problems during at least the years 2008, 2009, and 2010.

Around June 6, 2005, the Simonettas purchased certain real property in Virginia (Virginia property) for $1,012,672. The Simonettas resided at the Virginia property until December 2007 when Washington Mutual Bank foreclosed on that property.

On December 3, 2007, Shirley T. Grooms (Ms. Grooms), Mr. Simonetta's mother, and John E. Grooms (Mr. Grooms), Ms. Grooms' spouse, purchased certain real property in Arizona (Arizona property) for $627,784. (We shall refer collectively to Ms. Grooms and Mr. Grooms as the Groomses.) When the Groomses purchased the Arizona property, they intended the Simonettas to reside there and to make the payments on the note (Arizona property note) that they had signed in order to finance the purchase of that property. Around December 2007, the Simonettas moved to the Arizona property.

The Simonettas resided at the Arizona property throughout 2008, 2009, and 2010. At certain times while they were residing at the Arizona property, the Simonettas failed to make certain payments due on the Arizona property note. As a result, the noteholder twice scheduled the Arizona property for sale in foreclosure

(foreclosure sale). The first foreclosure sale, which was scheduled to take place on December 1, 2009, was avoided because the Groomses made a payment of approximately $16,000 on the total amount of the Arizona property note that was due and not paid at that time. The second foreclosure sale, which was scheduled to take place on January 5, 2011, was avoided when the Groomses made a payment of approximately $40,000 on the total amount of the Arizona property note that was due and not paid at that time.

During 2008, Ms. Simonetta received wage income of $307.68 from Take Charge America, Inc. (Take Charge America), and a distribution of $27,620.48 from Prudential Retirement (2008 retirement distribution).[2] Ms. Simonetta transferred the 2008 retirement distribution to Mr. Simonetta.

During 2009, Ms. Simonetta, who received a general equivalency degree in that year, received no wage or other income.

During 2010, Ms. Simonetta received wage income of $13,970, $527, and $2,824 from Manpower International, Inc., the Howroyd Wright Employment Agency, and the U.S. Department of Commerce, respectively.

---

[2]Ms. Simonetta received the 2008 retirement distribution in connection with her resigning from AFSCME around the end of 2007.

Throughout at least 2008, 2009, and 2010, Mr. Simonetta owned and operated Aerosystems Plus, LLC (Aerosystems), a sole proprietorship. Ms. Simonetta was not involved in the operation of Aerosystems. Ms. Simonetta believed on the basis of statements that Mr. Simonetta had made to her sometime after the end of 2008 that Aerosystems' most successful year since he began operating that business was 2008. Ms. Simonetta further believed on the basis of statements that Mr. Simonetta had made to her sometime after the end of 2009 that Aerosystems was even more successful during 2009 than it had been during 2008.

During at least 2008, 2009, and 2010, Mr. Simonetta controlled all of the finances of the Simonettas' household. During at least those years, Mr. Simonetta maintained in his sole name two bank accounts, one personal bank account and one business bank account for Aerosystems. In order to make certain household purchases, petitioner was required to ask Mr. Simonetta to sign a personal check or to let her use one of his credit cards for those purchases. At certain times while they were living in Arizona, Mr. Simonetta locked petitioner out of an office in their house where he kept their household financial documents and documents relating to Aerosystems.

The Simonettas signed and filed jointly Forms 1040, U.S. Individual Income Tax Return (return), for their taxable years 2008 (2008 joint return), 2009 (2009

joint return), and 2010 (2010 joint return) that a certified public accountant (return preparer) whom Mr. Simonetta retained had prepared. (We shall sometimes refer collectively to those joint returns as the joint returns in question.) Included with each of the joint returns in question was a Schedule C, Profit or Loss From Business, relating to Mr. Simonetta's sole proprietorship, Aerosystems.

It was Mr. Simonetta, not Ms. Simonetta, who provided the return preparer with certain information in order to assist him in the preparation of the joint returns in question and who met with him at the return preparer's office regarding that preparation. Except for signing each of the joint returns in question, Ms. Simonetta's involvement in the preparation and filing of each of the joint returns in question was limited to her giving Mr. Simonetta any Form W-2, Wage and Tax Statement (Form W-2), that she received for each of her taxable years 2008 and 2010, which Mr. Simonetta then provided to the return preparer for use in the preparation of each of the 2008 joint return and the 2010 joint return.[3] After the return preparer had completed his preparation of each of the joint returns in question and Mr. Simonetta had reviewed each of them, Mr. Simonetta placed each of

---

[3]The record does not establish whether Ms. Simonetta gave Mr. Simonetta Form 1099-R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., that she received from Prudential Retirement, that was attached to the 2008 joint return, and that showed the 2008 retirement distribution that she received. We presume that she did.

those returns in front of petitioner and directed her to sign each of them. At the time Ms. Simonetta signed each of the joint returns in question, she had no mental or physical health problems which prevented her from being able to understand the contents of each of those returns had Mr. Simonetta allowed her to review each of those returns before, after, or when he directed her to sign each of them.

Ms. Simonetta was not the victim of spousal abuse or domestic violence during 2008, 2009, and 2010.

In the 2008 joint return, the Simonettas showed, inter alia, (1) wages of $308 from Take Charge America, (2) taxable pensions and annuities of $27,620 from the 2008 retirement distribution, and (3) business income of $83,489 from Aerosystems. In that joint return, they claimed a withholding tax credit of $5,251[4] but did not claim any estimated tax payments because they had not made any estimated tax payments with respect to their taxable year 2008. In the 2008 joint return, the Simonettas showed tax due of $15,683. The Simonettas failed to pay the tax due shown in the 2008 joint return.

At the time Ms. Simonetta signed the 2008 joint return, she was aware that that return showed tax due. When Ms. Simonetta signed the 2008 joint return, she

---

[4]The Simonettas claimed a withholding tax credit of $5,251 in the 2008 joint return because Prudential Retirement had withheld that amount from the 2008 retirement distribution.

understood on the basis of discussions with Mr. Simonetta that he intended to pay the tax due shown in that return. At a time not established by the record after the Simonettas filed the 2008 joint return, Mr. Simonetta told petitioner that he was making payments to, and was in good standing with, the Internal Revenue Service (IRS).

In the 2009 joint return, the Simonettas showed only business income of $58,258 from Aerosystems. In that joint return, they claimed (1) no withholding tax credits because they had none and (2) no estimated tax payments because they had not made any estimated tax payments with respect to their taxable year 2009. In the 2009 joint return, the Simonettas showed tax due of $7,560. The Simonettas failed to pay the tax due shown in the 2009 joint return.

At the time Ms. Simonetta signed the 2009 joint return, she was aware that that return showed tax due. When Ms. Simonetta signed the 2009 joint return, she understood on the basis of discussions with Mr. Simonetta that he intended to pay the tax due shown in that return.

In the 2010 joint return, the Simonettas showed, inter alia, (1) wages of $17,321[5] and (2) business income of $44,088 from Aerosystems. In that joint re-

_____

[5]The wages of $17,321 that the Simonettas showed in the 2010 joint return consisted of the $13,970, $527, and $2,824 that Manpower International, Inc., the

(continued...)

turn, they claimed a withholding tax credit of $674[6] but did not claim any estimated tax payments because they had not made any estimated tax payments with respect to their taxable year 2010. In the 2010 joint return, the Simonettas showed tax due of $6,789. The Simonettas failed to pay the tax due shown in the 2010 joint return.

At the time Ms. Simonetta signed the 2010 joint return, she was aware that that return showed tax due. When Ms. Simonetta signed the 2010 joint return, she understood on the basis of discussions with Mr. Simonetta that he intended to pay the tax due shown in that return.

On December 22, 2010, petitioner filed a petition and thereby commenced a proceeding (Simonettas' divorce proceedings) in the Superior Court in Maricopa County, Arizona (Maricopa County court), for a decree dissolving her marriage to Mr. Simonetta. On April 13, 2011, a trial was held in the Simonettas' divorce proceedings. On April 21, 2011, the Maricopa County court issued a decree of dis-

---

[5](...continued)
Howroyd Wright Employment Agency, and the U.S. Department of Commerce, respectively, had paid to Ms. Simonetta.

[6]The Simonettas claimed a withholding tax credit of $674 in the 2010 joint return because Manpower International, Inc., and the U.S. Department of Commerce had withheld $578 and $96, respectively, or a total of $674, from the respective wages that they had paid to Ms. Simonetta during 2010.

solution of marriage (divorce decree). The divorce decree ordered in pertinent part:

> **IT IS ORDERED** that Father [Mr. Simonetta] shall be solely liable for, indemnify and hold Mother [petitioner] harmless from the following debts and financial obligations:
>
> *       *       *       *       *       *       *
>
> 2.      One-half the IRS debt in the approximate amount of $33,000.00. Father is not entitled to a reimbursement of amount paid since the date of service.
>
> *       *       *       *       *       *       *
>
> **IT IS FURTHER ORDERED** that Mother shall be solely liable for, indemnify and hold Father harmless from the following debts and financial obligations:
>
> *       *       *       *       *       *       *
>
> 2.      One-half the IRS debt. Father is not entitled to a reimbursement of amount paid since the date of service.

On April 26, 2013, the IRS received from Ms. Simonetta Form 8857, Request for Innocent Spouse Relief (Form 8857), in which she requested relief under section 6015 with respect to the Simonettas' taxable years 2008, 2009, and 2010. In that form, Ms. Simonetta did not check the box that would have indicated that she had signed each of the joint returns in question under duress.

On November 19, 2013, respondent's office in Covington, Kentucky (Covington office), which was responsible for processing requests under section 6015, issued a preliminary determination granting petitioner relief under section 6015 with respect to the Simonettas' taxable years 2008, 2009, and 2010. Mr. Simonetta, the so-called nonrequesting spouse, protested that preliminary determination. As a result, respondent's Covington office transferred Ms. Simonetta's Form 8857 to respondent's Appeals Office in Covington, Kentucky (Appeals Office).

The Appeals Office denied Ms. Simonetta's request for relief under section 6015 with respect to the Simonettas' taxable years 2008, 2009, and 2010, as set forth in the notice of determination that that office issued to her. The notice of determination stated in pertinent part: "The information we have available does not show you meet the requirements for relief."

As of the time of the trial in this case, Ms. Simonetta was employed as a senior executive assistant at Ernst & Young , LLP, a national accounting firm. Her annual salary at that time was approximately $64,995.

OPINION

Petitioner bears the burden of proving that she is entitled to the relief under section 6015(f) that she is seeking. See Rule 142(a); Porter v. Commissioner, 132

T.C. 203, 210 (2009). We apply a de novo scope and standard of review in reviewing a requesting spouse's request for relief. See Porter v. Commissioner, 132 T.C. at 210.

The parties agree that petitioner is not entitled to relief under section 6015(b) or (c).[7] They disagree over whether she is entitled to relief under section 6015(f) for each of the Simonettas' taxable years 2008, 2009, and 2010.

It is respondent's position that Ms. Simonetta is not entitled to the relief under section 6015(f) that she is seeking. In support of that position, respondent called Mr. Simonetta as respondent's witness at the trial in this case. We did not find Mr. Simonetta to be credible. We shall not rely on his testimony in order to establish respondent's position (and his) that Ms. Simonetta is not entitled to relief under section 6015(f) with respect to each of the Simonettas' taxable years 2008, 2009, and 2010. See, e.g., Tokarski v. Commissioner, 87 T.C. 74, 77 (1986).

Section 6015(f) provides:

SEC. 6015. RELIEF FROM JOINT AND SEVERAL LIABILITY
ON JOINT RETURN.

(f) Equitable Relief.--Under procedures prescribed by the
Secretary, if--

---

[7]Respondent concedes that relief is not available to petitioner under sec. 6015(b) or (c), thereby satisfying sec. 6015(f)(2).

(1) taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either); and

(2) relief is not available to such individual under subsection (b) or (c),

the Secretary may relieve such individual of such liability.

As directed by section 6015(f) and as pertinent here, the Commissioner of Internal Revenue has prescribed procedures that are applicable for the Simonettas' taxable years 2008, 2009, and 2010 and that are generally used in determining whether it would be inequitable to find the requesting spouse liable for part or all of the unpaid tax in question.[8] See Rev. Proc. 2013-34, sec. 4, 2013-43 I.R.B. 397, 399-403. While this Court is not bound by IRS revenue procedures, we often look to them for guidance, especially when we are presented with the issue of whether to grant a requesting spouse relief under section 6015(f). See Hollimon v. Commissioner, T.C. Memo. 2015-157, at *7-*8; see also Pullins v. Commissioner, 136 T.C. 432, 438-439 (2011).

_____

[8]We shall refer collectively to the respective taxes due shown in the joint returns in question and not paid by the Simonettas, as well as any additions to, and/or any penalties on, those unpaid taxes, and interest as provided by law, as the Simonettas' unpaid liabilities in question.

Those procedures include seven threshold conditions (threshold conditions) that must be satisfied for the requesting spouse to be eligible for equitable relief under section 6015(f). See Rev. Proc. 2013-34, sec. 4.01, 2013-43 I.R.B. at 399-400. In the instant case, respondent does not address, let alone dispute, that those conditions are satisfied. As a result, we conclude that respondent has abandoned any argument in this case that the threshold conditions in Rev. Proc. 2013-34, sec. 4.01, are not met with respect to any of the Simonettas' unpaid liabilities in question.

Where, as here, respondent has abandoned disputing whether the threshold conditions of Rev. Proc. 2013-34, sec. 4.01, are satisfied, Rev. Proc. 2013-34, sec. 4.02, 2013-43 I.R.B. at 400, sets forth circumstances under which the IRS will make streamlined determinations granting equitable relief to the requesting spouse under section 6015(f). The requesting spouse is eligible for streamlined determinations granting equitable relief under Rev. Proc. 2013-34, sec. 4.02, only in cases in which that spouse establishes, inter alia, that that spouse would suffer economic hardship if relief were not granted. See id. sec. 4.02(2), 2013-43 I.R.B. at 400. Ms. Simonetta concedes that she would not suffer economic hardship if relief under section 6015(f) were not granted to her. As a result, she does not qualify for streamlined determinations under Rev. Proc. 2013-34, sec. 4.02.

Where, as here, the requesting spouse satisfies the threshold conditions but does not satisfy all of the requirements of Rev. Proc. 2013-34, sec. 4.02, Rev. Proc. 2013-34, sec. 4.03(2), 2013-43 I.R.B. at 400-403, sets forth the following factors to be considered in determining whether a requesting spouse is entitled to relief under section 6015(f): (1) whether the requesting spouse is no longer married to the nonrequesting spouse (marital status factor); (2) whether the requesting spouse would suffer economic hardship if not granted relief (economic hardship factor); (3) whether the requesting spouse knew or had reason to know that the nonrequesting spouse would not pay the tax liability (knowledge factor); (4) whether the nonrequesting spouse has a legal obligation to pay the outstanding tax liability pursuant to a divorce decree or agreement (legal obligation factor); (5) whether the requesting spouse significantly benefited from the unpaid tax liability (significant benefit factor); (6) whether the requesting spouse has made a good faith effort to comply with the tax laws for the taxable years following the taxable years to which the request for such relief relates (compliance factor); and (7) whether the requesting spouse was in poor physical or mental health (health factor). The factors listed above are designed to serve as guides and are not intended to constitute an exclusive list. No one factor or a majority of factors necessarily determines the outcome. See id., 2013-43 I.R.B. at 400.

With respect to the marital status factor, the parties agree that at the time respondent made the determination set forth in the notice of determination, petitioner was no longer married to Mr. Simonetta. The marital status factor weighs in favor of relief. See id. sec. 4.03(2)(a), 2013-43 I.R.B. at 400.

With respect to the economic hardship factor, petitioner concedes that she would not suffer economic hardship if relief were not granted. The economic hardship factor is neutral. See id. sec. 4.03(2)(b), 2013-43 I.R.B. at 401.

With respect to the knowledge factor, petitioner must establish that she reasonably expected Mr. Simonetta to pay the tax due shown in each of the joint returns in question at the time each of those returns was filed or within a reasonable time after the filing of each of those returns. See Rev. Proc. 2013-34, sec. 4.03(2)(c)(ii), 2013-43 I.R.B. at 401. Respondent contends that "[p]etitioner knew or had reason to know that Mr. Simonetta would not pay the income tax liabilities reported on their returns for 2008, 2009, and 2010 [the joint returns in question]." In support of that contention, respondent maintains that "[the Simonettas'] unpaid medical bills and various foreclosure actions brought against her residence put petitioner on notice that Mr. Simonetta could not pay the tax liabilities." Petitioner counters that "[a]t the time the 2008, 2009, and 2010 returns were

signed, Petitioner did not know nor have reason to know that the taxes due would not be paid."

On the record before us, we agree with petitioner's contentions regarding the knowledge factor. On that record, we have found facts that support her contentions with respect to that factor, including the following. During at least 2008, 2009, and 2010, Mr. Simonetta controlled all of the finances of the Simonettas' household. During at least those years, Mr. Simonetta maintained in his sole name two bank accounts, one personal bank account and one business bank account for Aerosystems. In order to make certain household purchases, petitioner was required to ask Mr. Simonetta to sign a personal check or to let her use one of his credit cards for those purchases. At certain times while they were living in Arizona, Mr. Simonetta locked petitioner out of an office in their house where he kept their household financial documents and documents relating to Aerosystems.

It was Mr. Simonetta, not Ms. Simonetta, who provided the return preparer with certain information in order to assist him in the preparation of the joint returns in question and who met with him at the return preparer's office regarding that preparation. Except for signing each of the joint returns in question, Ms. Simonetta's involvement in the preparation and filing of each of the joint returns in question was limited to her giving Mr. Simonetta any Form W-2 that she received

for each of her taxable years 2008 and 2010, which Mr. Simonetta then provided to the return preparer for use in the preparation of each of the 2008 joint return and the 2010 joint return.[9] After the return preparer had completed his preparation of each of the joint returns in question and Mr. Simonetta had reviewed each of them, Mr. Simonetta placed each of those returns in front of petitioner and directed her to sign each of them.

At the time Ms. Simonetta signed each of the joint returns in question, she was aware that each of those returns showed tax due. When Ms. Simonetta signed each of the joint returns in question, she understood on the basis of discussions with Mr. Simonetta that he intended to pay the tax due shown in each of those returns.

At a time not established by the record after the Simonettas filed the 2008 joint return, Mr. Simonetta told petitioner that he was making payments to, and was in good standing with, the IRS. Moreover, Ms. Simonetta believed on the basis of statements that Mr. Simonetta had made to her sometime after the end of 2008 that Aerosystems' most successful year since he began operating that business was 2008. Ms. Simonetta further believed on the basis of statements that Mr.

---

[9]See supra note 3.

Simonetta had made to her sometime after the end of 2009 that Aerosystems was even more successful during 2009 than it had been during 2008.

On the record before us, we find that petitioner reasonably expected Mr. Simonetta to pay the tax due shown in each of the joint returns in question at the time each of those returns was filed or within a reasonable time after the filing of each of those returns. The knowledge factor weighs in favor of relief. See Rev. Proc. 2013-34, sec. 4.03(2)(c).

With respect to the legal obligation factor, the parties agree that the divorce decree obligated each of the Simonettas to pay one-half of the Simonettas' unpaid liabilities in question. The legal obligation factor is neutral. See id. sec. 4.03(2)(d), 2013-43 I.R.B. at 402.

With respect to the significant benefit factor, the parties agree that petitioner did not significantly benefit from not paying the tax due shown in each of the joint returns in question. The significant benefit factor is neutral. See id. sec. 4.03(2)(e).

With respect to the compliance factor, the parties agree that petitioner has complied with the tax laws for the taxable years after the taxable years at issue. The compliance factor weighs in favor of relief. See id. sec. 4.03(2)(f)(i).

With respect to the health factor, the parties agree that petitioner was at no relevant time in poor physical or mental health. The health factor is neutral. See id. sec. 4.03(2)(g), 2013-43 I.R.B. at 403.

Based upon our examination of the entire record before us, we find that petitioner has carried her burden of establishing that it would be inequitable to hold her liable for the Simonettas' unpaid liabilities in question. On that record, we further find that petitioner has carried her burden of establishing that she is entitled to relief under section 6015(f) with respect to those respective unpaid liabilities for the Simonettas' taxable years 2008, 2009, and 2010.

We have considered all the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

<u>Decision will be entered for</u> <u>petitioner</u>.