T.C. Summary Opinion 2016-76

UNITED STATES TAX COURT

BOHONG ZHANG, Petitioner, AND THOMAS MCKEE, CONSERVATEE,
BARBARA STRAIT, CONSERVATOR, Intervenor <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 828-15S.                          Filed November 9, 2016.

Bohong Zhang, pro se.

Barbara Strait (conservator), for intervenor.

<u>Sebastian Voth</u>, for respondent.

SUMMARY OPINION

GUY, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions

of section 7463 in effect when the petition was filed.[1]  Pursuant to section 7463(b),

_____

[1]Unless otherwise indicated, all section references are to the Internal

(continued...)

the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined that petitioner is not entitled to relief from joint and several liability under section 6015 for the taxable years 2007 and 2008. Petitioner filed with the Court a timely petition for review of respondent's determination.[2]  Petitioner's former spouse, through a conservator, filed a timely notice of intervention pursuant to section 6015(e)(4).  The issue for decision is whether petitioner qualifies for spousal relief under section 6015(f) for the taxable years 2007 and 2008.

## Background

Some of the facts have been stipulated and are so found.  The stipulation of facts and the accompanying exhibits are incorporated herein by this reference.

---

[1](...continued)
Revenue Code, as amended and in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar.

[2]At the time the petition was filed, petitioner resided in California.

## I. Petitioner's Background

Petitioner was born in Changchun, China, and she completed high school and earned credits at the university level while living there. In July 1995 she immigrated to the United States.

Petitioner has two daughters from an earlier marriage and, during the period in question, was receiving alimony and child support payments (for one daughter) from her former spouse. Petitioner owned a home in Mira Loma, California.

## II. Intervenor's Background

Intervenor had been employed in the retail clothing business over a career that spanned more than 30 years. He began work as a sales clerk and retired in 2004 as vice president of sales. He owned a condominium unit in Tustin, California, where he resided, and a rental property in Huntington Beach, California.

## III. Petitioner and Intervenor's Marriage

Petitioner met intervenor at a singles party in January 2005. They entered into a prenuptial agreement on August 11, 2005, which stated that, upon their marriage, each of them would retain his or her premarital property and be responsible for personal debts. They were married at the Bellagio Hotel in Las

Vegas, Nevada, on August 13, 2005. Although petitioner's family attended the wedding, intervenor's family and friends were not invited.

A. The Tustin Ranch Home

Petitioner moved into intervenor's Tustin condominium after they were married, and they initially made renovations to the unit. Shortly thereafter, however, intervenor sold both the Tustin condominium and his Huntington Beach rental property, and petitioner sold her Mira Loma home. The couple then jointly purchased a new home in Tustin Ranch, California (Tustin Ranch home), for $930,000. Intervenor and petitioner contributed $400,000 and $200,000 of their separate funds, respectively, as a downpayment on the residence, and they obtained a mortgage for the balance of the purchase price. Although there was a second mortgage on the Tustin Ranch home, there is no documentation in the record regarding that loan.

B. Social Security Benefits

After his marriage to petitioner, intervenor (who was eligible for Social Security benefits) assisted petitioner and one of her daughters in applying for and obtaining Social Security benefits.

C.  Household Expenditures

The record is unclear as to how petitioner and intervenor managed their household finances.  Although petitioner testified that intervenor controlled the couple's finances and that she generally was unaware of the couple's income and expenses, she failed to produce bank records that would shed light on this aspect of their relationship.

The couple maintained a high standard of living during their marriage. They frequently dined in expensive restaurants, took shopping trips, and drove expensive automobiles.  During the marriage petitioner took multiple trips to China and Canada, intervenor paid for petitioner's mother's transportation to the United States from China, and they traveled together on gambling excursions and took a trip to Hawaii.

D.  Intervenor's Emerging Health Problems

Beginning in 2005, intervenor's longtime friend, Richard Scott, began to notice a gradual deterioration in intervenor's memory and a change in his general demeanor and behavior.  Over time, Mr. Scott observed that intervenor had difficulty remembering the names of his family members and that he became introverted and less sure of himself.

E.  Consulting Business and Bankruptcy

Shortly after his marriage to petitioner, intervenor started a retail clothing consulting business.  In 2007 and 2008 intervenor withdrew $325,000 and $154,988 from his individual retirement accounts (IRAs), respectively.  It appears that intervenor used some of these funds to support his consulting business.  The business eventually failed, and intervenor filed for bankruptcy in 2009.

F.  Sale of the Tustin Ranch Home

In early 2009 the couple could no longer pay the mortgage on the Tustin Ranch home.  It appears that petitioner moved out of the home sometime in 2009.  On January 14, 2010, the couple sold the Tustin Ranch home for $775,062.  After paying off two mortgage loans on the property (totaling approximately $640,000) and accounting for other expenses, petitioner and intervenor received a disbursement of approximately $80,000 at closing--an amount that petitioner acknowledged that she kept as her own.

G.  Petitioner's Real Estate Transactions

In March 2010 petitioner purchased a residence (in her name only) in Chino Hills, California, for $365,000.  At the same time, intervenor executed a grant (quitclaim) deed surrendering his community property interest in that property.  In May 2014 petitioner applied for and obtained a $225,000 line of credit secured by

the Chino Hills residence. The loan application listed the fair market value of the residence as $550,000. In February 2016 petitioner sold the Chino Hills residence for $510,000, and soon thereafter she purchased a new residence for $368,000.

H. The Couple's Divorce

In late 2009 petitioner assisted intervenor in renting a room from an acquaintance of hers in a boarding-house-like arrangement. The record does not reflect intervenor's monthly income in 2009 although it was Mr. Scott's impression that intervenor had little disposable income and was living on modest monthly Social Security benefits. At the same time, petitioner moved into the Chino Hills residence.

On February 21, 2013, petitioner and intervenor executed a marital settlement agreement (agreement). The agreement stated that petitioner would take the Chino Hills residence as her sole and separate property, intervenor would pay petitioner monthly spousal support equal to 30% of his monthly income until the earlier of either spouse's death or petitioner's remarriage, petitioner would receive a 2013 Toyota Camry (although intervenor was required to make loan payments and pay for insurance and maintenance on the vehicle), intervenor was "fully responsible for all tax bills, and all debts from IRS", and intervenor would pay for both parties' cellular phone charges until February 2015.

Petitioner initiated divorce proceedings which were not contested by intervenor. On August 22, 2013, the Superior Court of California, County of Los Angeles, entered a final judgment of dissolution of marriage.

I. Appointment of a Conservator

On September 23, 2013, intervenor signed a power of attorney appointing his brother, Robert McKee, and his sister, Barbara Strait, as his attorneys-in-fact. On July 1, 2014, the Superior Court of California, County of Ventura, granted Ms. Strait temporary conservatorship over intervenor's person and property. The same court granted Ms. Strait permanent conservatorship authority on September 2, 2014.

IV. Tax Returns for 2007 and 2008

Petitioner and intervenor filed a joint Federal income tax return for 2007, reporting wage income of $18,094 (attributable primarily to intervenor's work as a consultant), a taxable IRA distribution of $325,000, and a loss of $145,121 attributable to intervenor's consulting business. Although they reported total tax of $25,740 and tax due of $23,171, they failed to remit payment with the tax return.

Petitioner and intervenor filed a joint Federal income tax return for 2008, reporting no wages, taxable IRA distributions of $154,988, and a business loss of

$19,035. Although they reported total tax of $10,929 and tax due of $9,732, they failed to remit payment with the tax return.

V.  Petitioner's Request for Spousal Relief

On April 30, 2013, the Internal Revenue Service (IRS) sent a letter to petitioner requesting that she pay the tax due for 2007 and 2008. On May 7, 2013, petitioner submitted to the IRS a Form 8857, Request for Innocent Spouse Relief, for the taxable years 2007, 2008, and 2009. Petitioner acknowledged at trial that the Form 8857 contained numerous inaccuracies and misstatements. For example, she incorrectly stated in the Form 8857 that: (1) she had separated from intervenor and was not living with him in 2007, 2008, or 2009; (2) her highest level of education was high school; (3) she did not incur any large expenses (such as trips, home improvements, or automobile purchases) during the period in question; and (4) her mother coowned the Chino Hills residence with her and that the fair market value of the property was $125,000.

Petitioner indicated on the Form 8857 that she had signed the tax returns in question under duress. She stated that she cannot read English and did not understand the information reported in the tax returns.

Petitioner acknowledged on the Form 8857 that she had not been abused by intervenor and that she did not have a mental or physical health problem at the

time she completed the form or when the tax returns in question were filed.  She reported that she had monthly income of $860 (alimony of $660 and child support of $200) and monthly expenses of $862.

Ms. Strait, in her capacity as intervenor's attorney-in-fact, submitted to the IRS a Form 12509, Statement of Disagreement, alleging that intervenor had significant cognitive impairments throughout his marriage to petitioner, that petitioner took control of the couple's finances, and that she ultimately chose not to pay the tax due for the taxable years 2007 and 2008.

As mentioned above, the IRS issued to petitioner a final determination denying her request for spousal relief for the taxable years 2007 and 2008. Because there was no tax due for the taxable year 2009, that year is not addressed in the notice of determination and is not at issue in this case.

At the time of trial, petitioner was employed and acknowledged that she was earning $1,700 monthly.  The parties stipulated that "[p]etitioner received alimony from her former spouses that she did not report on her tax returns filed after her divorce to intervenor."

Discussion

I. Relief From Joint and Several Liability

Generally, married taxpayers may elect to file a joint Federal income tax return. Sec. 6013(a). After making the election, each spouse is jointly and severally liable for the entire tax due. Sec. 6013(d)(3). If certain requirements are met, however, an individual may be relieved of joint and several liability under section 6015.

The Court applies a de novo scope and standard of review in deciding whether a taxpayer is entitled to relief under section 6015. See Wilson v. Commissioner, 705 F.3d 980, 993-994 (9th Cir. 2013), aff'g T.C. Memo. 2010-134; Porter v. Commissioner, 132 T.C. 203, 210 (2009). Except as otherwise provided in section 6015, the taxpayer (requesting spouse) bears the burden of proving entitlement to relief. Rule 142(a); Porter v. Commissioner, 132 T.C. at 210.

Three forms of relief are available under section 6015. In general, section 6015(b) provides full or apportioned relief from joint and several liability for understatements of tax on a return, section 6015(c) provides apportioned relief in respect of a deficiency to taxpayers who are divorced or separated, and in certain circumstances section 6015(f) provides equitable relief from joint and several

liability if relief is not available under subsection (b) or (c). Relief is not available in this case under subsection (b) or (c) because the amounts due for 2007 and 2008 are attributable to underpayments of tax as opposed to understatements of tax or tax deficiencies. Consequently, we must decide whether petitioner is entitled to equitable relief under section 6015(f).

Section 6015(f) grants the Commissioner discretion to relieve an individual from joint and several liability if, taking into account all the facts and circumstances, it is inequitable to hold the individual liable for any unpaid tax or any deficiency (or any portion of either). The Commissioner has prescribed guidelines in Rev. Proc. 2013-34, 2013-43 I.R.B. 397, modifying and superseding Rev. Proc. 2003-61, 2003-2 C.B. 296, that are considered in determining whether it is inequitable to hold a requesting spouse liable for all or part of the liability for any unpaid tax or deficiency.[3] Although the Court consults these guidelines when reviewing the Commissioner's denial of relief, see Washington v. Commissioner, 120 T.C. 137, 147-152 (2003), we are not bound by them inasmuch as our analysis and determination ultimately turn on an evaluation of all the facts and

_____

[3]Rev. Proc. 2013-34, sec. 7, 2013-43 I.R.B. 397, 403, makes the guidelines effective for requests for relief filed on or after September 16, 2013, and requests for equitable relief pending on September 16, 2013, whether before the IRS, the Office of Appeals, or a Federal court.

circumstances, see Pullins v. Commissioner, 136 T.C. 432, 438-439 (2011); Porter v. Commissioner, 132 T.C. at 210; Hudgins v. Commissioner, T.C. Memo. 2012-260, at *39-*40.

## II. Threshold Conditions

Rev. Proc. 2013-34, sec. 4.01, 2013-43 I.R.B. at 399-400, sets forth seven threshold conditions that must be satisfied before the Commissioner will consider a request for equitable relief under section 6015(f). There is no dispute that petitioner satisfies the seven threshold conditions.

## III. Streamlined Determination

Rev. Proc. 2013-34, sec. 4.02, 2013-43 I.R.B. at 400, sets forth elements that a requesting spouse must satisfy to qualify for a streamlined determination under section 6015(f).[4] Petitioner does not qualify for streamlined relief because,

---

[4]Rev. Proc. 2013-34, sec. 4.02, 2013-43 I.R.B. at 400, as is relevant here, permits relief if all the following elements are satisfied: (1) on the date the IRS makes its determination, the requesting spouse is no longer married to, or is legally separated from, the nonrequesting spouse, is a widow or widower and is not an heir to the nonrequesting spouse's estate that would have sufficient assets to pay the tax liability, or has not been a member of the same household as the nonrequesting spouse at any time during the 12-month period ending on the date the IRS makes its determination; (2) the requesting spouse will suffer economic hardship if relief is not granted; and (3) on the date the joint return was filed, the requesting spouse did not know or have reason to know the nonrequesting spouse would not or could not pay the underpayment of the tax reported on the joint return.

as discussed in detail below, she will not suffer economic hardship if relief is not granted.

A requesting spouse will suffer economic hardship if payment of part or all of the tax liability "will cause the requesting spouse to be unable to pay reasonable basic living expenses." Id. sec. 4.03(2)(b), 2013-43 I.R.B. at 401; see sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs. The determination as to what constitutes a reasonable amount for basic living expenses may vary with the circumstances of the individual taxpayer but will not include the maintenance of an affluent or luxurious lifestyle. Sec. 301.6343-1(b)(4)(i), Proced. & Admin Regs. The requesting spouse must introduce evidence at trial supporting her claim that economic hardship will occur. Johnson v. Commissioner, T.C. Memo. 2014-240 (citing Pullins v. Commissioner, 136 T.C. at 446-447).

On this record, we conclude that petitioner would not suffer economic hardship if she were obliged to pay the tax due in this case. At the time of trial petitioner was employed and earning $1,700 monthly. She also acknowledged that she had equity of $370,000 in a residence that she purchased shortly before trial. Although petitioner vaguely suggested that she provides support for one of her daughters and her mother, she did not provide any financial records or other documents to support or quantify that claim. Therefore, we conclude that payment

of the tax liabilities in issue would not leave petitioner unable to pay reasonable basic living expenses.

IV. Facts and Circumstances Analysis

Where a requesting spouse meets the threshold conditions for relief but fails to qualify for streamlined relief, the Commissioner may nevertheless grant relief after considering the following nonexclusive list of factors set forth in Rev. Proc. 2013-34, sec. 4.03, 2013-43 I.R.B. at 400-403: (1) whether the requesting spouse is separated or divorced from the nonrequesting spouse; (2) whether the requesting spouse will suffer economic hardship if relief is not granted; (3) whether on the date the joint return was filed the requesting spouse did not know and had no reason to know that the nonrequesting spouse would not or could not pay the tax liability; (4) whether the requesting or nonrequesting spouse has a legal obligation to pay the tax liability pursuant to a decree of divorce or other agreement; (5) whether the requesting spouse received a significant benefit from the unpaid income tax liability; and (6) whether the requesting spouse has made a good-faith effort to comply with the Federal income tax laws for the taxable years following the taxable year(s) to which the request for relief relates. Two additional factors that the Commissioner may consider in favor of granting relief are whether: (1) the nonrequesting spouse abused the requesting spouse and (2) the requesting

spouse was in poor mental or physical health at the time the joint return was filed or when the requesting spouse requested relief. See id. sec. 4.03(2)(c)(iv), (g).[5]

## 1. Marital Status

If the requesting spouse is no longer married to the nonrequesting spouse as of the date that the IRS makes its determination, this factor weighs in favor of relief. Id. sec. 4.03(2)(a). Petitioner and intervenor were divorced before the IRS made its determination denying petitioner spousal relief. It follows that this factor weighs in favor of relief.

## 2. Economic Hardship

As discussed above, denying petitioner spousal relief will not cause her to suffer economic hardship. Consequently, this factor is neutral.

## 3. Knowledge or Reason To Know

In the case of an underpayment of tax due, this factor turns on whether, as of the date the return was filed or the date the requesting spouse reasonably believed the return was filed, the requesting spouse knew or had reason to know that the nonrequesting spouse would not or could not pay the tax at that time or within a reasonable time after the filing of the return. Id. sec. 4.03(2)(c)(ii).

---

[5]The revenue procedure recognizes that the issue of abuse can be relevant to the analysis of various factors and can negate the presence of certain factors. Rev. Proc. 2013-34, sec. 3.01, 2013-43 I.R.B. at 398.

Petitioner testified that she signed the tax returns for 2007 and 2008 without examining them and that she was unaware that tax was due for those years. We are not persuaded by petitioner's self-serving testimony on this point and have good reason to doubt her veracity considering the multiple misstatements that she made when she completed Form 8857 and submitted it to the IRS.

Petitioner was aware at the time the couple's tax returns for 2007 and 2008 were filed that intervenor was no longer working. In the light of the decline in intervenor's memory and cognitive skills during this period, the financial losses that intervenor had experienced in his consulting business, and the couple's inability to make mortgage payments in early 2009, we cannot accept petitioner's statement that she simply turned a blind eye to the couple's tax liabilities. In sum, we conclude that it was unreasonable for petitioner to believe that intervenor would or could pay the tax reported to be due on the couple's joint returns for 2007 and 2008 at the time those tax returns were filed. Therefore, this factor weighs against relief.

### 4. Legal Obligation

This factor will weigh in favor of relief if the nonrequesting spouse has the sole legal obligation to pay the outstanding tax liability pursuant to a divorce decree or other legally binding agreement. Rev. Proc. 2013-34, sec. 4.03(2)(d).

However, where the requesting spouse knows or has reason to know, when entering into the divorce decree or agreement, that the nonrequesting spouse cannot pay the outstanding income tax liability, this factor will be neutral. Id.

Intervenor's health continued to decline from 2013 into 2014 such that we now know his sister would soon be appointed as the conservator of his person and property. At the same time, and despite his recent financial setbacks, intervenor executed the marital settlement agreement and agreed to make alimony payments to petitioner, pay off a car loan, pay for petitioner's cellular phone service for a period, and assume responsibility for the couple's tax liabilities. Considering all the circumstances, we conclude that petitioner had every reason to know that intervenor could not pay the couple's outstanding income tax liabilities. Therefore, this factor is neutral.

5. Significant Benefit

This factor calls for an evaluation of whether petitioner received a significant benefit, beyond normal support, from the underpayments of tax. See id. sec. 4.03(2)(e); see also sec. 1.6015-2(d), Income Tax Regs. If so, this factor will weigh against relief. Normal support is measured by the circumstances of the particular parties. Porter v. Commissioner, 132 T.C. at 212.

During the period under review petitioner enjoyed trips to China, Hawaii, and Canada. She drove luxury vehicles and went on gambling excursions with intervenor to Las Vegas. She collected $80,000 from the sale of the couple's Tustin Ranch home in January 2010 and considered those funds her own. On this record, we conclude that petitioner received significant benefit from the underpayments of tax for taxable years 2007 and 2008, beyond normal support, and, therefore, this factor weighs against relief.

### 6. Compliance With Tax Laws

If the requesting spouse is in compliance with the income tax laws for taxable years following the taxable years to which the request for relief relates, this factor will weigh in favor of relief. Rev. Proc. 2013-34, sec. 4.03(2)(f). If the requesting spouse is not in compliance, then this factor will weigh against relief. Id.

In taxable years after the years in issue petitioner received alimony payments from her former spouses that she failed to report as income. In the absence of any evidence that petitioner made a good-faith effort to comply with Federal income tax laws, we conclude that this factor weighs against relief.

7. Mental or Physical Health

This factor will weigh in favor of relief if the requesting spouse was in poor mental or physical health at the time the relevant return was filed or at the time she requested relief.  Id. sec. 4.03(2)(g).  If the requesting spouse was in neither poor physical nor poor mental health then this factor is neutral.  Id.

When petitioner submitted her request for spousal relief, she reported that she was not in poor mental or physical health at that time or when she signed the tax returns for the years in issue.  Therefore, we find that this factor is neutral.

V. Conclusion

After weighing all of the facts and circumstances of this case, we conclude that it would not be inequitable to deny petitioner spousal relief for the years in issue.  In sum, petitioner knew or should have known that intervenor would not or could not pay the tax liabilities when the tax returns were filed or when he executed the marital settlement agreement.  She received substantial benefit from the unpaid tax liabilities, beyond normal support, and she has not been in compliance with the income tax laws for taxable years following the taxable years to which the request for relief relates.

To reflect the foregoing,

Decision will be entered

for respondent.
