T.C. Memo. 2018-93

UNITED STATES TAX COURT

KIMBERLY R. HALE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 18664-14, 10262-15.[1]          Filed June 26, 2018.

P and H filed joint Federal income tax returns for the years 2004 through 2009. Although each return reported a liability owed, that liability was not paid with the filing of the return. P did not become aware of the unpaid liabilities until after H's death. During his life, H, who was the family's sole income earner, funded life insurance policies that provided P with almost $8 million of benefits upon his death. The probate assets of H's estate, however, were insufficient to satisfy claims against the estate. P filed two Forms 8857, Request for Innocent Spouse Relief, covering the years in issue. Neither form reported her receipt of life insurance proceeds. After those requests were filed, P and H's tax liabilities for the years in issue were paid in full.

_____

[1]We consolidated the cases at docket Nos. 18664-14 and 10262-15 for trial, briefing, and opinion.

**[*2]**      Held:  Because P and H's tax liabilities for the years in issue were necessarily paid out of the proceeds of life insurance H purchased and funded with his own income, the fact that P did not suffer economic hardship as a result of the satisfaction of those liabilities weighs against granting relief notwithstanding Rev. Proc. 2013-34, sec. 4.03(2)(b), 2013-43 I.R.B. 397, 401.

Held, further, the insolvency of H's probate estate and R's likely inability to collect from other sources any amount refunded to P also weigh against her claim for relief, as does her failure to disclose on her Forms 8857 the life insurance proceeds she received.

Held, further, because the factors that support relief--P's reasonable expectation that H would pay the tax shown as due on their returns for the years in issue and her mental state following H's death--do not outweigh the contravening factors, it is not inequitable to deny P refund of any amounts she paid in satisfaction of her and H's income tax liabilities for the years in issue.

Thomas R. Buckner, for petitioner.

Beth A. Nunnink and W. Benjamin McClendon, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  These consolidated cases arise from requests by petitioner for equitable relief from joint and several liability for Federal income tax for her taxable (calendar) years 2004 through 2009.  The Internal Revenue Service (IRS) denied petitioner's request for 2008 and 2009 and took no action in

[*3] response to her request for 2004 through 2007.  In response, petitioner

brought these actions.  See sec. 6015(e)(1)(A).[2]  She resided in Alabama when she

filed her petitions in these cases.  We have jurisdiction to determine any

appropriate relief available to her.  See id.; Pullins v. Commissioner, 136 T.C. 432,

438 (2011).  Both the scope and standard of our review are de novo.  See Pullins

v. Commissioner, 136 T.C. at 438.  Petitioner bears the burden of proof.  See Rule

142(a); Pullins v. Commissioner, 136 T.C. at 438.

For the reasons explained below, we conclude that petitioner is not entitled

to equitable relief from joint and several liability for the years in issue.

FINDINGS OF FACT

Petitioner and Stephen Hale's Lifestyle During the Years in Issue

Petitioner and Stephen Hale were married in 2003.  In April 2003, Mr. Hale

purchased real estate at 89 S. Front Street in Memphis, Tennessee (Front Street

property).  At the time of purchase, the Front Street property needed extensive

renovations, which took three years.  The renovations resulted in the creation of

three apartments.  The Hales used one of the apartments as their residence and

rented out the other two.  Sometime before 2004, the Hales acquired a timeshare

---

[2]All section references are to the Internal Revenue Code of 1986, as
amended, and all Rule references are to the Tax Court Rules of Practice and
Procedure.

**[*4]** interest in a condominium in Cancun, Mexico, which they used for annual one-week vacations.

During the years in issue, petitioner, who has degrees in biology but took no business, accounting, or tax courses in college, maintained the family household and cared for the three children she had with Mr. Hale. She had no full-time employment outside the home. At trial, petitioner testified that "after my third child I experienced postpartum depression". Although she said she was "on medicine for that", she did not describe the cost of the treatment.

The Hales' Financial Circumstances

Mr. Hale was an attorney who, from the early 1990s through the mid-2000s, was a name partner of a general practice firm. After that firm merged with a larger firm, Mr. Hale and two partners formed a new firm of which he was, again, a name partner. Mr. Hale's new firm encountered financial difficulties as a result of adverse market conditions in 2007 through 2009.

Mr. Hale developed a plan to revive his firm's fortunes that included the creation of a business called "B-Docs", which would use technology to streamline the process of bankruptcy filings. Technological difficulties, however, prevented B-Docs from becoming the successful business Mr. Hale had envisioned.

[*5]  Mr. Hale's longtime friend and accountant, J. Anthony Marston, described him as "very controlling" and offered that "one of the criticisms" he had of Mr. Hale is that "he did not turn over the accounting to the professionals quickly enough".  Thus, the ability of Mr. Marston and his firm, the Marston Group, PLC, to assist Mr. Hale was hindered by the fact that the professional accountants "were always a little bit behind the curve in terms of what * * * [they] knew about the true financial situation of the law firm."

Petitioner testified that she was not in charge of household finances.  Mr. Hale kept the checkbook, had all bills sent to his office, and paid the bills from there.

The Hales' Tax Returns for the Years in Issue

The tax returns that petitioner filed with Mr. Hale for the years in issue reported liabilities that were not paid with the filing of the returns.  Petitioner testified that, when Mr. Hale brought home the returns Mr. Marston had prepared, she would sign them and Mr. Hale "would send them off."  She "assumed that everything had been taken care of."

The 2010 Tax Lien

On August 30, 2010, respondent filed a notice of Federal tax lien against petitioner and Mr. Hale regarding their joint income tax liabilities for their taxable

[*6] years 2004 through 2008. Respondent sent the lien notice to Mr. Hale at his law firm.

Mr. Hale's Death and Its Aftermath

The Front Street property was subject to two mortgages. First Tennessee Bank, the holder of the second mortgage, filed a suit to collect unpaid interest. On May 27, 2011, a hearing was scheduled in the case at which Mr. Hale did not appear. It was later discovered that he had on that day taken his own life.

After Mr. Hale's death, Mr. Marston went through Mr. Hale's office and found evidence of many outstanding business and personal debts, including household bills, unopened IRS correspondence, default notices and creditor lawsuits. As a result of Mr. Marston's investigation, petitioner learned that Mr. Hale had not paid the couple's tax liabilities for the years in issue.

Petitioner testified that she "was a mess * * * just trying to survive" and care for her sons while dealing with the shock of her husband's death. Therefore, although Mr. Hale's will named her executor of his estate, she "didn't feel like * * * [she] could do what needed to be done." When petitioner declined to serve as executor, her father, Steven Reid, who was named as successor executor in Mr. Hale's will, served in that capacity. Petitioner also relied on her father and professional advisers to help her deal with her finances.

**[*7]**   Petitioner testified that, because of her concern about the impact of Mr. Hale's death on their children, she and the two oldest boys "went to counseling for about a year to a year and a half."

Mr. Hale's Estate

The Tennessee inheritance tax return filed by Mr. Hale's estate reported a gross estate of $17,092,954.  The bulk of the reported gross estate consisted of $15,707,860[3] of insurance on Mr. Hale's life, and the Front Street property, valued at $1,187,650.  The beneficiaries of the insurance policies were petitioner, Mr. Hale's children, and his law firm.  Mr. Hale's estate was not named a beneficiary of any of the insurance policies.  The inheritance tax return reported a marital deduction for bequests to petitioner of $8,152,414, which included life insurance proceeds of $7,954,970.  The inheritance tax return also reported funeral and administration expenses of $332,719, debts of $5,889,052, and mortgages of $3,106,288.

Petitioner testified that she did not know that Mr. Hale had maintained substantial insurance on his life.  Because she "had no input into the [family's] finances", Mr. Hale had not discussed the insurance policies with her.  Although sufficient insurance remained in place at Mr. Hale's death to provide petitioner, his

---

[3]We round all dollar amounts to the nearest dollar.

[*8] children, and his law firm with over $15 million in benefits, other policies he had purchased had lapsed because the premiums on those policies were not paid.

After Mr. Hale's death, the Front Street property mortgages went into foreclosure. Mr. Marston testified that, to his knowledge, Mr. Hale's estate did not receive any proceeds attributable to that property.[4]

Petitioner's Receipt of Life Insurance Proceeds

On June 24, 2011, American National Insurance Co. paid petitioner $3,229,971 in life insurance proceeds. On December 29, 2011, ING ReliaStar Life Insurance Co. paid petitioner $4,721,415, which was deposited in a transitional ING account in petitioner's name.

Revenue Officer Huston's Inquiry Concerning the Insurance Proceeds

A few weeks after Mr. Hale's death, Revenue Officer (RO) Kimberly Huston was assigned to collect petitioner and Mr. Hale's tax liabilities for the years in issue. RO Huston's investigations led her to believe that one of the mortgages on the Front Street property had been paid off with insurance proceeds. On January 4, 2012, RO Huston inquired of Elizabeth Coleman, an attorney who

---

[4]The Tennessee inheritance tax return filed by Mr. Hale's estate, which reported mortgages in excess of the value of the Front Street property, supports Mr. Marston's testimony.

[*9] worked for the Marston Group, PLC, about the existence of proceeds from insurance policies on Mr. Hale's life.

Reinvestment of the Insurance Proceeds

Anthony Bradley, the attorney for Mr. Hale's estate, testified that petitioner's father, Mr. Reid "handle[d] the investment of the life insurance proceeds that * * * [petitioner] received." According to Mr. Bradley: "After some of the insurance proceeds started to come in, * * * [petitioner] was still overwhelmed, and I remember that the meeting with she and her mom and dad at my office, and I believe she endorsed the checks, and handed those to him and asked him to take care of that, because also at that time she was under a lot of stress from outside sources, you know, and other people." Mr. Bradley acknowledged that he had given Mr. Reid advice regarding the deployment of the insurance proceeds: He referred to "multiple discussions regarding" the implications, in terms of Federal Deposit Insurance Co. (FDIC) protection, of dispersing assets in different accounts at different banks.

On January 10, 2012, about a week after RO Huston's inquiry of Ms. Coleman regarding the existence of life insurance proceeds, petitioner signed three checks totaling $4,721,000 drawn on her ING transition account. One of the checks, for $981,000, was payable to the order of People's Bank, with "C.D.

[*10] Payment" written on the memo line. Another check, for $3,500,000, was payable to the order of Wayne County Bank, with "5-CD" written on the memo line. The third check, for $240,000, was payable to the order of Hardin County Bank, with "CD .75% For 6 Months" written on the memo line. The writing on each check, other than petitioner's signature, appears to be in a hand different from hers.

Also on January 10, 2012, the three banks listed as payees on the checks petitioner drew on her ING account issued certificates of deposit (CDs) in the name of Mr. Reid or Doris Faye Reid, petitioner's mother. People's Bank issued to Mr. Reid two CDs in the amounts of $681,000 and $500,000. Wayne County Bank issued five CDs in the amounts of $250,000, $500,000, $1,250,000, $1,250,000, and $250,000. The five Wayne County CDs are payable upon the death of the named account holder to petitioner (either alone or with other family members). Hardin County Bank issued to Mr. Reid a six-month CD in the amount of $240,000 bearing interest at 0.75%.

Petitioner's Requests for Innocent Spouse Relief

In May 2012, petitioner submitted two Forms 8857, Request for Innocent Spouse Relief. One form related to the taxable years 2004 through 2006; the other related to the taxable years 2007 through 2009.

**[*11]** In response to an inquiry about petitioner's assets, each Form 8857 refers to an attached statement. The referenced statement in each form is identical and reads: "My automobile is leased and there are no vehicles owned in my name. I have some personal property such as household furniture and contents, clothing, and wedding ring given to me by my husband. I do not know the value of the household items. I have an individual retirement account that holds West Tennessee Bancshares, Inc. stock, but I do not know the value of that." Each form reports monthly income of $6,478 and expenses of $7,951.

Ms. Coleman prepared the Forms 8857 for petitioner's signature. When asked whether she had read the Form 8857 she had submitted for the taxable years 2004 through 2006 before signing it, petitioner answered: "I don't recall."

Payment of the Hales' Tax Liabilities for the Years in Issue

On July 12, 2012, Mr. Bradley sent to RO Huston a cashier's check payable to the order of the "U.S. Department of Treasury" for $1,500,000. The check identifies the remitter as "Estate of Stephen P. Hale". The transmittal letter accompanying the check identifies the payment as being made "on behalf of the Estate of Stephen P. Hale" and requests that the payment be applied to amounts owed for the taxable years 2004 through 2009.

[*12] Four days later, on July 16, 2012, Mr. Bradley sent to RO Huston a cashier's check for $350,273 payable to "United States Treasury". The check identifies the remitter as "The Bradley Law Firm, IOLTA". The transmittal letter accompanying the check describes the payment as being made "on behalf of Kimberly Reid Hale, pursuant to * * * [RO Huston's] computation." The letter asks that the funds be applied "to the taxes, penalties and interest for the tax periods December 31, 2004 through December 31, 2009, of Stephen P. Hale * * * and Kimberly Reid Hale." As a result of the July 2012 payments, the liabilities reported on the Hales' Federal income tax returns for the years in issue were paid in full.

Petitioner's Tax Reporting Following Mr. Hale's Death

Petitioner filed Federal income tax returns for her taxable years 2013 and 2014. Petitioner's 2014 income tax return showed adjusted gross income of $171,043.

OPINION

I.    Introduction

As a general rule, spouses making a joint Federal income tax return are jointly and severally liable for all taxes shown on the return or found to be owing. Sec. 6013(d)(3). In some situations, however, a joint return filer can avoid joint and several liability by qualifying for relief under section 6015. That section

[*13] offers three types of relief:  (1) elective relief under section 6015(b) from liability for an understatement attributable to an "erroneous item[]" of the other spouse of which the electing spouse was unaware, (2) apportionment of liability under section 6015(c) for divorced or separated taxpayers, and (3) equitable relief under section 6015(f) when relief is unavailable under either section 6105(b) or (c).  The parties agree that petitioner is eligible to be considered for relief under section 6015(f) because relief is not available to her under section 6015(b) or (c).

Section 6015(f) allows the Secretary to relieve from joint and several liability for an unpaid tax or deficiency an individual not entitled to relief under section 6015(b) or (c) when "taking into account all the facts and circumstances, it is inequitable to hold the individual liable".  The statute directs that any relief under section 6015(f) be granted in accord with "procedures prescribed by the Secretary".

II.    Rev. Proc. 2013-34

A.    Introduction

In compliance with the statutory mandate, the Commissioner has issued a series of revenue procedures to guide in the determination of whether a taxpayer is entitled under section 6015(f) to relief from joint and several liability.  The most recent of those, Rev. Proc. 2013-34, 2013-43 I.R.B. 397, lists factors that IRS

**[\*14]** employees should consider. We routinely consult the factors listed in the applicable revenue procedure when reviewing the IRS' determination not to provide relief. See Pullins v. Commissioner, 136 T.C. at 439.

Rev. Proc. 2013-34, sec. 4.01, 2013-43 I.R.B. at 399, lists seven threshold conditions that must be met for a requesting spouse to be eligible for equitable relief under section 6015(f). The parties agree that petitioner meets those conditions.

Rev. Proc. 2013-34, sec. 4.02, 2013-43 I.R.B. at 400, describes circumstances in which the IRS will make streamlined determinations granting equitable relief under section 6015(f). To be eligible for a streamlined determination, the requesting spouse, among other things, must establish, under guidelines provided in Rev. Proc. 2013-34, sec. 4.03(2)(b), 2013-43 I.R.B. at 401, that she "[w]ould suffer economic hardship if relief were not granted". Id. sec. 4.02(2), 2013-43 I.R.B. at 400. As noted infra, part II.B.2., petitioner concedes that she does not meet the economic hardship standards of Rev. Proc. 2013-34, sec. 4.03(2)(b). Therefore, petitioner is ineligible for a streamlined determination in her favor in accordance with Rev. Proc. 2013-34, sec. 4.02.

Although section 6015(f) refers to unpaid tax liabilities and deficiencies, the prior satisfaction of petitioner and Mr. Hale's tax liabilities for the years in issue

[*15] does not render her ineligible for relief. Rev. Proc. 2013-34, sec. 4.04, 2013-43 I.R.B. at 404, provides that "a requesting spouse is eligible for a refund of separate payments made by the requesting spouse after July 22, 1998, if the requesting spouse establishes that the funds used to make the payment for which a refund is sought were provided by the requesting spouse."[5]

B.     Factors for Determining Whether To Grant Equitable Relief

Rev. Proc. 2013-34, sec. 4.03, "applies to a requesting spouse who requests relief under * * * section 6015(f), and who satisfies the threshold conditions of section 4.01, but does not qualify for streamlined determinations granting relief under section 4.02." Id. sec. 4.03(1), 2013-43 I.R.B. at 400. Rev. Proc. 2013-34, sec. 4.03(2), lists seven nonexclusive factors to be considered in determining whether, taking into account all the facts and circumstances, equitable relief under section 6015(f) should be granted. As applicable to the present case, those factors are: (1) "[w]hether the requesting spouse is no longer married to the nonrequesting spouse", (2) "[w]hether the requesting spouse will suffer economic hardship if relief is not granted", (3) "whether, as of the date the return was filed or the date the requesting spouse reasonably believed the return was filed, the

_____

[5]July 22, 1998, was the date of enactment of the legislation that added sec. 6015 to the Code. Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, sec. 3201, 112 Stat. at 734.

[*16] requesting spouse knew or had reason to know that the nonrequesting spouse would not or could not pay the tax liability at that time or within a reasonable period of time after the filing of the return", (4) "[w]hether the requesting spouse or the nonrequesting spouse has a legal obligation to pay the outstanding Federal income tax liability" under "a divorce decree or other binding agreement", (5) "[w]hether the requesting spouse significantly benefitted from the unpaid income tax liability or understatement", (6) "[w]hether the requesting spouse has made a good faith effort to comply with the income tax laws" in subsequent taxable years, and (7) "[w]hether the requesting spouse was in poor physical or mental health * * * at the time the return or returns * * * [to] which the request for relief relates were filed * * * or at the time the requesting spouse requested relief." Id. sec. 4.03(2)(a), (b), (c)(ii), (d), (e), (f), (g), 2013-43 I.R.B. at 400-405.

Because Rev. Proc. 2013-34, sec. 4.01, does not bar petitioner from relief and she is not entitled to streamlined relief under Rev. Proc. 2013-34, sec. 4.02, her eligibility for relief is governed by Rev. Proc. 2013-34, sec. 4.03, taking into account the factors set forth in section 4.03(2). We address below each of those factors, along with other facts and circumstances we view as relevant to the issue of petitioner's entitlement to equitable relief under section 6015(f).

**[*17]**       1.       Marital Status

a.       Applicable Guidelines

Rev. Proc. 2013-34, sec. 4.03(2)(a), states: "If the requesting spouse is still married to the nonrequesting spouse, this factor is neutral. If the requesting spouse is no longer married to the nonrequesting spouse, this factor will weigh in favor of relief." A widow or widower is treated as no longer married to the nonrequesting spouse only if the surviving spouse "is not an heir to the nonrequesting spouse's estate that would have sufficient assets to pay the tax liability". Id. sec. 4.03(2)(a)(iii), 2013-43 I.R.B. at 400.

b.       The Parties' Positions

Petitioner acknowledges that she "was Mr. Hale's heir" and that, "while Mr. Hale's probate estate was insufficient to pay the income tax liability, his gross estate was sufficient." On that basis, petitioner accepts that the marital status factor is neutral.

Respondent agrees that the marital status factor is neutral, but for a different reason. He recognizes petitioner as a widow and agrees that "she is an heir to the non-requesting spouse's estate." Rather than viewing Mr. Hale's estate as lacking sufficient funds to pay the liability, however, respondent claims that the estate in fact paid $1,500,000 of the liability. Although respondent accepts that petitioner

**[*18]** paid at least $350,273 of the liability herself, in treating the marital status factor as neutral, respondent implicitly argues that Mr. Hale's estate could have paid the tax liability in full.

### c. Analysis

We need not resolve the parties' dispute about the source of the payments that satisfied the Hales' joint tax liabilities for their taxable years 2004 through 2009. Even if petitioner in fact paid the liabilities herself and the estate would have been unable to satisfy the liabilities out of the assets available to the executor, we would agree with petitioner that it would be appropriate nonetheless to treat the marital status factor as neutral. That factor seems to rest on the premise that, all else being equal, it would be inequitable to require one spouse to bear in full the tax on the other spouse's income. In any case involving a request for equitable relief under section 6015(f), the tax in issue will be a tax on the income of the nonrequesting spouse, because one of the threshold conditions for relief listed in Rev. Proc. 2013-34, sec. 4.01, is that "[t]he income tax liability from which the requesting spouse seeks relief is attributable * * * to an item of the nonrequesting spouse or an underpayment resulting from the nonrequesting spouse's income." Id. sec. 4.01(7). Even when the underpayment in issue is attributable to the income of the nonrequesting spouse, however, denying relief

**[*19]** under section 6015(f) may not require the requesting spouse to bear the liability for the tax on that income if the couple remains married and continues to pool assets. When the couple's assets remain pooled, it is difficult to associate a tax payment with either spouse. But if the individuals are no longer married and no longer pool their assets, the tax will be borne by only one of them. In those circumstances, equity generally favors collecting the tax from the person whose income gave rise to the liability.

When the tax liability in issue relates to income of a deceased spouse, collecting the tax from the surviving spouse will cause her to bear the economic burden of the tax unless she received sufficient assets from the deceased spouse's estate to satisfy the tax. Therefore, Rev. Proc. 2013-34, sec. 4.03(2)(a) appropriately considers whether the surviving spouse is an heir of the deceased spouse's estate, as well as the assets of the estate available to pay the tax.[6]

---

[6]As we understand its purpose, Rev. Proc. 2013-34, sec. 4.03(2)(a), 2013-43 I.R.B. 397, 400, appears to be inartfully drafted. The relevant question should be whether the surviving spouse received, or can expect to receive, by reason of the deceased spouse's death, sufficient assets to enable the surviving spouse to pay the tax liability in issue. That will not be the case merely because the surviving spouse is an heir of the estate and the estate as a whole has sufficient assets to pay the tax. The surviving spouse may receive a bequest insufficient to pay the tax. To that extent, collecting the tax from her would require her to bear the tax liability on her late husband's income.

**[\*20]** As petitioner observes, the life insurance proceeds she received were not assets of Mr. Hale's probate estate.  E.g., Ogden v. Hooks, 168 S.W.2d 793, 796 (Tenn. Ct. App. 1941) ("It is well settled that the proceeds of a life insurance policy payable to a designated beneficiary other than the personal representative do not become a part of the assets of the estate of the insured, and are not subject to administration and the payment of debts.").  But under the apparent rationale for the revenue procedure guideline, the exclusion of those amounts from Mr. Hale's probate estate ought not to matter.  The only apparent source of funds from which petitioner could have paid the tax liabilities in issue was the insurance proceeds she received as a result of Mr. Hale's death--resources that were available to her only because of his payment of insurance premiums out of his income before he died.  Therefore, denying relief to petitioner would not result in her bearing in full a tax liability arising from Mr. Hale's income.  That petitioner is no longer married to Mr. Hale should not weigh in favor of granting her the relief she seeks.

      2.     Economic Hardship

      a.     Applicable Guidelines

Rev. Proc. 2013-34, sec. 4.03(2)(b), states:  "If denying relief from the joint and several liability will cause the requesting spouse to suffer economic hardship, this factor will weigh in favor of relief.  If denying relief from the joint and several

[*21] liability will not cause the requesting spouse to suffer economic hardship, this factor will be neutral."  The treatment of the absence of economic hardship in Rev. Proc. 2013-34, supra, reflects a change from the standards in effect before its promulgation.  Prior revenue procedures issued under section 6015(f) had treated an absence of economic hardship as weighing against the granting of relief.  See, e.g., Rev. Proc. 2003-61, sec. 4.03(2)(a)(ii), 2003-2 C.B. 296, 298,[7] modified and superseded by Rev. Proc. 2013-34, supra; Rev. Proc. 2000-15, sec. 4.03(2)(d), 2000-1 C.B. 447, 449, superseded by Rev. Proc. 2003-61, supra.

b.    The Parties' Positions

Petitioner "concedes that she had sufficient funds to pay" her and Mr. Hale's tax liabilities for the years in issue and "acknowledges that she did not suffer economic hardship as a result of paying the tax liabilities".

---

[7]Rev. Proc. 2003-61, sec. 4.03(2)(a)(ii), 2003-2 C.B. 296, 298, stated only that "[w]hether the requesting spouse would suffer economic hardship * * * if the Service does not grant relief from the income tax liability" was a relevant factor, without specifying how the presence or absence of economic hardship would be taken into account.  In practice, however, the IRS apparently continued to treat the absence of economic hardship as weighing against relief, as had been the case under Rev. Proc. 2000-15, 2000-1 C.B. 447.  See Rev. Proc. 2013-34, sec. 3.06, 2013-43 I.R.B. at 398 ("Section 4.03(2)(b) * * * now provides that the lack of a finding of economic hardship does not weigh against relief, as it did under Rev. Proc. 2003-61, and instead will be neutral.").

[*22] Although Rev. Proc. 2013-34, sec. 4.03(2)(b), provides that the absence of economic hardship is a neutral factor, respondent argues that, in this case, the economic hardship factor "weighs against granting relief." He claims that, "because petitioner received over $8 million from Stephen Hale's estate and her monthly income exceeds expenses by approximately $6,300.00, she will not suffer an economic hardship."[8]

### c.    Analysis

The parties agree that petitioner did not suffer economic hardship as a result of her payment of the tax liabilities in issue. Their dispute centers on the import of petitioner's lack of economic hardship. Again, under Rev. Proc. 2013-34, supra, currently in effect, the absence of economic hardship is a neutral factor. Respondent does not explain his departure from the standards announced in his own revenue procedure. Instead, his argument simply elaborates on a point petitioner concedes: Her payment of her and Mr. Hale's joint income tax liabilities for the taxable years 2004 through 2009 did not cause her economic hardship.

---

[8]Respondent made his calculation of the excess of petitioner's monthly income over her expenses by dividing by 12 the adjusted gross income petitioner reported on her 2014 Federal income tax return and comparing the result ($171,043 ÷ 12 = $14,254) with the $7,951 monthly expenses she reported on her Forms 8857 ($14,254 – $7,951 = $6,303).

**[\*23]** Respondent is, in effect, trying to revert to the standards in effect under Rev. Proc. 2003-61, supra, which Rev. Proc. 2013-34, supra, modified and superseded.

Although we might properly hold respondent to the standards of Rev. Proc. 2013-34, supra, we are not bound by those standards. E.g., Boyle v. Commissioner, T.C. Memo. 2016-87, at \*9. As explained infra part II.C., we conclude that, under the circumstances of the present case, petitioner's ability to pay the tax liabilities in issue (to the extent that she in fact paid them) out of the proceeds of insurance purchased by Mr. Hale weighs against her claim for relief.

        3.     Knowledge or Reason To Know

        a.     Applicable Guidelines

Rev. Proc. 2013-34, sec. 4.03(2)(c), states:

> (ii) Underpayment cases. In the case of an income tax liability that was properly reported but not paid, \* \* \* [the knowledge or reason to know] factor will weigh in favor of relief if the requesting spouse reasonably expected the nonrequesting spouse to pay the tax liability reported on the return. \* \* \*
>
> This factor will weigh against relief if, based on the facts and circumstances of the case, it was not reasonable for the requesting spouse to believe that the nonrequesting spouse would or could pay the tax liability shown on the return. For example, if prior to the return being filed, or the date the requesting spouse reasonably believed the return was filed, the requesting spouse knew of the nonrequesting spouse's prior bankruptcies, financial difficulties, or other issues with the Service or other creditors, or was otherwise

[*24] aware of difficulties in timely paying bills, then this factor will generally weigh against relief.

Depending on the facts and circumstances, if * * * the nonrequesting spouse maintained control of the household finances by restricting the requesting spouse's access to financial information, and because of the * * * financial control, the requesting spouse was not able to question the payment of the taxes reported as due on the return or challenge the nonrequesting spouse's assurance regarding payment of the taxes for fear of the nonrequesting spouse's retaliation, this factor will weigh in favor of relief even if the requesting spouse knew or had reason to know about the nonrequesting spouse's intent or ability to pay the taxes due.

*      *      *      *      *      *      *

(iii) Reason to know. The facts and circumstances that are considered in determining whether the requesting spouse had * * * reason to know whether the nonrequesting spouse could or would pay the reported tax liability * * * include, but are not limited to, the requesting spouse's level of education, any deceit or evasiveness of the nonrequesting spouse, the requesting spouse's degree of involvement in the activity generating the income tax liability, the requesting spouse's involvement in business or household financial matters, the requesting spouse's business or financial expertise, and any lavish or unusual expenditures compared with past spending levels.

b.      The Parties' Positions

Petitioner claims that the "knowledge or reason to know" factor weighs in her favor because she reasonably expected Mr. Hale to pay the tax liabilities shown on their returns for the years in issue. She describes herself as "a stay-at-home mother with no financial background." She alleges that, during her marriage

**[*25]** to Mr. Hale, "she was not involved in household financial decisions and did not contribute to the preparation of the tax returns." She notes that "the mail" (presumably meaning mail relating to tax and financial matters) was sent to Mr. Hale at his law firm. She claims not to have had access to their joint accounts. Mr. Hale, who "controlled the household finances", "deceived" her by keeping her "unaware" of the couple's "financial difficulties and tax problems." She claims that her testimony in that regard is supported by Mr. Marston's description of Mr. Hale as having had a "controlling personality."

Respondent, by contrast, claims that, after Mr. Hale's death, petitioner "structure[d] her assets in various nominee accounts to avoid collection of income tax." He invites us to infer that one who possesses "the financial wherewithal" to engage in such maneuvers would not have countenanced exclusion from family financial decisions.

Respondent claims that petitioner and Mr. Hale accumulated significant assets during the years in issue and that that accumulation should have given petitioner reason to suspect that Mr. Hale had not paid their tax liabilities. Respondent describes as "lavish purchases" the couple's acquisition of a Cancun timeshare and the Front Street property.

[*26] Because petitioner year after year joined Mr. Hale in filing returns that reported unpaid liabilities, respondent argues that, "[a]t some point, she should have asked if, and how, her joint tax liabilities would be paid." Respondent finds "unbelievable" the prospect that petitioner "would file a joint tax return for six successive years and never question why such large underpayments were shown thereon or not paid."

Finally, respondent argues that the lien notice filed against her and Mr. Hale in 2010 "would have put petitioner on notice regarding the underpayments" of tax.

c.     Analysis

The dispersal of insurance proceeds among multiple certificates of deposit in different names at different banks need not be viewed as evidence of financial acumen on petitioner's part. Petitioner relied on her father to invest the insurance proceeds, which he did, at least in part, on the basis of Mr. Bradley's advice. Mr. Bradley referred to "multiple discussions regarding" the implications, in terms of FDIC protection, of dispersing assets in different accounts at different banks. Whatever the motivations underlying the investment of the insurance proceeds petitioner received--whether or not the dispersal of those funds among multiple CDs issued in the names of petitioner's parents was done (as respondent claims) to hide assets from the IRS--the actions in question were carried out by petitioner's

[*27] father. The record provides no evidence of the extent to which petitioner herself participated in the implementation of that plan, beyond endorsing checks to her father, or even knew about it. Therefore, we cannot treat the investment of insurance proceeds as rebutting petitioner's disavowals of financial expertise.

Contrary to respondent's claim, the Front Street property and the Cancun timeshare were not assets "accumulated" during the years in issue. The parties stipulated that Mr. Hale purchased the Front Street property in April 2003 (although petitioner testified that renovations continued for three years thereafter) and that the Hales owned their timeshare interest "[a]t all times during the period 2004 through 2009". Moreover, even if those assets had been purchased during the years in issue, petitioner would have had no reason to suspect that the purchases were made with funds that could otherwise have been used to satisfy unpaid tax liabilities if, as she claims, Mr. Hale had kept to himself information about the family's financial circumstances. Respondent offered no evidence to refute petitioner's claimed lack of involvement in family financial matters. He seeks only to dismiss petitioner's testimony as "self-serving and uncorroborated".

Finally, respondent's claim about the 2010 lien notice is both incorrect and irrelevant. The lien notice--apparently like other tax and financial information-- was sent to Mr. Hale at his law firm. Moreover, even if the lien notice had been

[*28] sent to the Hales' residence, thus potentially alerting petitioner to the unpaid tax liabilities, her awareness of those liabilities at that time would have been irrelevant under the applicable guidelines. Rev. Proc. 2013-34, sec. 4.03(2)(c)(ii), asks what the requesting spouse knew or should have known when the returns for the years in issue were filed.

In short, respondent has given us no reason to question petitioner's testimony regarding her lack of involvement in family financial matters. We conclude that petitioner, whom we found to be a credible witness, has established that she expected Mr. Hale to make appropriate arrangements to pay the tax liabilities shown on the couple's returns for the years in issue and that, under the circumstances, her expectation was reasonable.

### 4. Legal Obligation

#### a. Applicable Guidelines

The legal obligation factor weighs in favor of relief if a divorce decree or other legally binding agreement imposes on the nonrequesting spouse the sole legal obligation to pay the outstanding tax liability. Rev. Proc. 2013-34, sec. 4.03(2)(d), 2013-43 I.R.B. at 402. The factor is neutral, however, "if the requesting spouse knew or had reason to know, when entering into the divorce decree or agreement, that the nonrequesting spouse would not pay the income tax

**[*29]** liability." Id. The factor is also neutral if the spouses are not separated or divorced, and it weighs against relief if the requesting spouse has the sole legal obligation to pay the tax.

### b. The Parties' Positions

The parties agree that the legal obligation factor is neutral.

### 5. Significant Benefit

Rev. Proc. 2013-34, sec. 4.03(2)(e), states:

A significant benefit is any benefit in excess of normal support. For example, if the requesting spouse enjoyed the benefits of a lavish lifestyle, such as owning luxury assets and taking expensive vacations, this factor will weigh against relief. If, however, the nonrequesting spouse controlled the household and business finances * * * such that the nonrequesting spouse made the decision on spending funds for a lavish lifestyle, then this mitigates this factor so that it is neutral. If only the nonrequesting spouse significantly benefitted from the unpaid tax * * * and the requesting spouse had little or no benefit, or the nonrequesting spouse enjoyed the benefit to the requesting spouse's detriment, this factor will weigh in favor of relief. * * *

### a. The Parties' Positions

Petitioner claims that the only benefit she received from Mr. Hale's income was "normal support." She says that the family's "lifestyle did not change during the tax years * * * [in] issue relative to the prior years." She claims not to have

[*30] had "any unusual or lavish expenses." She acknowledges the couple's Cancun timeshare but claims that that was their "only vacation property".

Respondent counters that "[p]etitioner did receive a significant benefit: at least $8 million of life insurance proceeds paid to her." According to respondent: "It stands to reason that these high-value policies were funded, at least in part, by the failure of the responsible parties to pay the income tax liabilities for the years at issue in this case." Respondent claims that, in addition, the Hales "accumulated other assets during the years at issue, including their real property interest in Cancun, Mexico and their personal residence which included two rental apartments."

Petitioner argues that, because the claims against Mr. Hale's estate exceeded the life insurance proceeds she received, "it does not 'stand to reason' that the life insurance is traceable to the tax liability." She also claims that, even if Mr. Hale's failure to pay their tax liabilities allowed him to fund the policies that provided her with about $8 million after his death, the benefit she thereby received should nonetheless be a neutral factor because Mr. Hale made the decision to invest in the policies.

**[*31]**        b.    <u>Analysis</u>

The evidence does not establish that petitioner received no benefit other than normal support from Mr. Hale's failure to pay their income tax liabilities for the years in issue. First, an annual one-week stay in Cancun could well be viewed as an "expensive vacation", even if the trip involved no lodging costs because it involved the use of a timeshare interest owned by the vacationers. Of course, we do not know that the funds Mr. Hale might otherwise have used to pay the couple's income tax liabilities were used instead to pay costs of the family's annual Cancun vacations. In fact, given money's fungibility, it would be unrealistic in most cases to expect to trace unpaid liabilities to specific expenditures. Mr. Hale's struggling business ventures apparently made considerable demands on his resources. But at the same time that he sought, unsuccessfully, to sustain those ventures, he also purchased or continued to fund a substantial amount of insurance on his life. That some policies eventually lapsed for nonpayment of premiums suggests that, had Mr. Hale fully paid the couple's income tax liabilities when due, he might have been forced to allow other policies to lapse, including some or all of the policies that provided petitioner with about $8 million in benefits upon his death. Petitioner thus has not established that Mr. Hale was the only one who benefited from the unpaid tax liabilities. <u>See</u> <u>George v. Commissioner</u>, T.C. Memo.

[*32] 2004-261, 2004 WL 2601319, at *8 (treating as a significant benefit a requesting spouse's receipt of life insurance proceeds on the death of the nonrequesting spouse).

But the extent to which the "significant benefit" factor would otherwise weigh against petitioner is mitigated by the evidence that Mr. Hale controlled the family's finances and decided to make the expenditures that benefited petitioner. Thus, despite the prospect that petitioner significantly benefited from the unpaid tax liabilities, this factor, at least under the revenue procedure guidelines, is neutral.[9]

### 6. Compliance With Income Tax Laws

#### a. Applicable Guidelines

In regard to a requesting spouse's compliance with income tax laws in subsequent taxable years, Rev. Proc. 2013-34, sec. 4.03(2)(f), provides separate guidelines for varying circumstances. Rev. Proc. 2013-34, sec. 4.03(2)(f)(ii) and (iii), deals with a requesting spouse who remains married but files a joint or separate return, respectively, while section 4.03(2)(f)(i) deals with a requesting

---

[9]For the reasons explained infra part II.C., we ultimately conclude that petitioner's receipt of proceeds from insurance policies on Mr. Hale's life that were more than sufficient to pay the couple's joint tax liabilities for the years in issue weighs against her claim for relief under sec. 6015(f).

[*33] spouse who is divorced. That section states: "If the requesting spouse is compliant for taxable years after being divorced from the nonrequesting spouse, then this factor will weigh in favor of relief. If the requesting spouse is not compliant, then this factor will weigh against relief. If the requesting spouse made a good faith effort to comply with the tax laws but was unable to fully comply, then this factor will be neutral."

Rev. Proc. 2013-34, sec. 4.03(2)(f), provides no guidelines specifically applicable to a requesting spouse who is a widow or widower. For purposes of applying the compliance with income tax laws factor, however, the circumstances of a widowed spouse are sufficiently analogous to those of a divorced spouse that we will apply the guidelines provided in Rev. Proc. 2013-34, sec. 4.03(2)(f)(i), with appropriate modifications, in the present case. In particular, we will consider petitioner's compliance with the income tax laws for the taxable years after Mr. Hale's death.

b.      The Parties' Positions

Petitioner claims that she has filed all required income tax returns and has no balance owing for the tax years subsequent to 2009. She acknowledges that her requests for innocent spouse relief did not list among her assets the proceeds she received from insurance on Mr. Hale's life but attributes that omission to a "lack of

[*34] communication" among her advisers. She also attributes to reliance on advice of others (her father and Mr. Bradley) her transfer of insurance proceeds to family members. She claims that those transfers were not intended "to purposefully conceal funds from the IRS, but instead * * * to obtain greater FDIC insurance coverage and avoid harassment from creditors." Because her omission of the insurance proceeds from her Forms 8857 "does not establish a lack of good-faith compliance on * * * [her] part", petitioner claims that the compliance with income tax laws factor weighs in favor of granting her the refund she requests. Moreover, she argues that, were we to find that she was not in compliance, "extenuating circumstances" would render that factor neutral. She does not explicitly describe those circumstances she claims would excuse any noncompliance.

Respondent apparently does not dispute that petitioner complied with the requirements for filing income tax returns and paying income tax for years after Mr. Hale's death. Instead, respondent bases his position on allegations of asset concealment:

> In 2011 and 2012, petitioner actively tried to conceal assets from the respondent when respondent tried to collect the tax liabilities for the years at issue. * * * She did this by withdrawing $4.7 million and opening Certificates of Deposit in the names of nominees. * * * She also failed to disclose all of her assets on the Forms 8857--Request

[*35] for Innocent Spouse Relief, which she signed under penalties of
perjury. * * * And she proceeded to omit these assets despite her
attorney's advice to include them. * * * These are not the actions of
someone who is making efforts to comply with the income tax laws.
Thus, this factor weighs against relief.

Respondent also claims that any failures of petitioner's advisers should be
attributed to her under "well settled" agency law.

c.   Analysis

Strictly speaking, the compliance factor, as articulated in Rev. Proc. 2013-
34, supra, may weigh in petitioner's favor. There seems to be no dispute that
petitioner filed the income tax returns required of her for taxable years after Mr.
Hale's death and paid any tax shown as due on those returns. The actions of which
respondent complains may not have clearly violated any income tax laws.
Whether a requesting spouse must disclose a contingent interest in a financial
account payable upon the death of the named account holder may be an open
question. And petitioner's failure to pay gift tax on any taxable gifts she made to
her parents would not violate income tax laws.

Notwithstanding the specific terms of Rev. Proc. 2013-34, sec. 4.03(2)(f),
however, we are unwilling to disregard the transfer of insurance proceeds to
accounts in the name of petitioner's parents and the (perhaps consequent) failure to
mention her interests in the insurance proceeds on her Forms 8857. By offering

[*36] explanations for those actions, petitioner seems to concede that they can be considered in applying the compliance factor. And those actions tend to undercut petitioner's claim that it would be inequitable not to grant her the refund she seeks.

Petitioner walks a fine--if not evanescent--line in attempting to distinguish the IRS from other creditors. She admits that the reinvestment of her insurance proceeds had as at least one of its purposes "avoid[ing] harassment from creditors". But she denied any effort "to purposefully conceal funds from the IRS". She would thus have us believe that she was not trying to hide assets from respondent but instead to hide them from other, perhaps spurious, creditors. Her claims that the reinvestment was also motivated by a desire to obtain greater FDIC protection is belied by the fact that most of the certificates of deposit (five out of eight) were over the $250,000 limit on FDIC insured deposits in effect since 2008. https://en.wikipedia.org/wiki/Federal_Deposit_Insurance_ Corporation. The timing of the transfers, about one week after RO Huston inquired of Elizabeth Coleman about petitioner's receipt of insurance proceeds as a result of Mr. Hale's death, may also be viewed with suspicion.

We find it difficult to attribute the omission of assets from petitioner's Form 8857 entirely to her advisers' failure to communicate. We sympathize with petitioner's situation as a grieving widow dealing with the shock of her husband's

**[*37]** suicide and her discovery of financial problems that included unpaid income tax. (Indeed, those may be the unspecified "extenuating circumstances" to which she alludes.) In those circumstances, she understandably turned to family members and professional advisers for help. But her reliance on others to prepare her requests for innocent spouse relief does not excuse her apparent failure to notice and inquire about the omission of the insurance proceeds--an omission that should have been obvious to her (had she read the forms before signing them). The statement submitted in response to the inquiry about her assets, which lists only a few items and assigns no specific values to them, would lead an unsuspecting reader to believe that petitioner lacked the resources to pay the tax liabilities from which she sought relief. But when she signed the forms that included that statement, petitioner had already received (and apparently endorsed to her father) checks for over $3 million in satisfaction of insurance policies on Mr. Hale's life. And she had given her father other checks totaling $4.7 million that depleted the transitional ING account that held additional insurance proceeds. Whether or not attorney Bradley specifically advised her to include the life insurance proceeds on her Forms 8857, petitioner had reason to question Ms. Coleman about the proceeds' omission.

**[\*38]**      7.      Mental or Physical Health

          a.      Applicable Guidelines

In regard to the mental or physical health factor, Rev. Proc. 2013-34, sec.

4.03(2)(g), states:

> This factor will weigh in favor of relief if the requesting spouse was
> in poor mental or physical health at the time the return or returns for
> which the request for relief relates were filed (or at the time the
> requesting spouse reasonably believed the return or returns were
> filed), or at the time the requesting spouse requested relief.  The
> Service will consider the nature, extent, and duration of the condition,
> including the ongoing economic impact of the illness.  If the
> requesting spouse was neither in poor physical nor poor mental
> health, this factor is neutral.

          b.      The Parties' Positions

Petitioner claims that the mental or physical health factor weighs in her

favor.  On brief, she claims to have "suffered from post-partum depression

following the birth of her children in 2004, 2006, and 2007 that required

medication."  In addition, she argues "that she suffered severely from shock,

anxiety and other mental struggles following the suicide of Mr. Hale".  She claims

that testimony from Messrs. Bradley and Marston vouched for her "poor mental

state" after Mr. Hale's death.

Respondent claims that "petitioner was both physically and mentally healthy

when the returns for the tax years at issue were filed".  He dismisses petitioner's

[*39] claims about her health on the grounds that they are supported only by her "self-serving testimony".  Respondent also alleges that any health issues that petitioner faced after Mr. Hale's death did not prevent her from "engag[ing] in a complicated scheme in an attempt to evade collection of her 2004-2009 unpaid income tax liabilities by, among other actions * * * shifting money from life insurance accounts to CDs in the names of nominees."  While respondent concedes that "the death of Stephen Hale caused petitioner significant emotional distress", he nonetheless concludes:  "[B]ased on the dearth of evidence regarding * * * [petitioner's] mental and physical state and other actions taken contemporaneously with the filing of the request for innocent spouse relief, this factor is neutral."

c.     Analysis

Although we are sympathetic to petitioner's experience of postpartum depression, we see no reason, under the circumstances, to give that experience much weight in support of her claim for relief.  To begin with, her argument on brief exaggerates her testimony at trial.  On brief, she claims to have suffered depression after the birth of each of her three children.  In her trial testimony, by contrast, she referred only to having experienced that condition after delivering her third child.  Although she said she was "on medicine for that", she did not

[*40] describe the cost of the treatment. Moreover, by her own testimony, she was not involved with handling the couple's income tax filings for the years in issue. Therefore, whatever difficulties might have arisen from her bout (or bouts) of depression, the failure to pay the taxes reported on the joint returns she filed with Mr. Hale for the years in issue cannot be attributed to petitioner's mental condition during those years.

And, as noted above, we are also sympathetic to petitioner's condition in the aftermath of Mr. Hale's death. She was understandably in shock and under stress. For those reasons, she felt she would be unable to fulfill her duties as executor of Mr. Hale's estate. But other than petitioner's reference to counseling for up to a year and a half following Mr. Hale's death, we have no evidence of the severity or duration of her condition. And the counseling appears to have been at least as much for her two older boys as for her. On the other hand, respondent has offered no evidence to rebut petitioner's testimony. (Contrary to respondent's argument, the fact that petitioner's testimony furthered her case does not warrant dismissing it.) And the alleged scheme to evade the collection of tax does not refute petitioner's claim of mental health problems. Her distraught mental state following Mr. Hale's death is one of the reasons she relied on others to handle her financial affairs. Any scheme to evade the collection of tax was implemented not

[*41] by petitioner but by her father. The record does not demonstrate the extent to which petitioner was involved with or even aware of any such scheme. On balance, we view the mental or physical health factor as weighing slightly in petitioner's favor.

C.      Weighing the Factors

A simple toting up of the factors for and against relief, as those factors are articulated in Rev. Proc. 2013-34, sec. 4.03(2), would support granting petitioner the relief she seeks. The knowledge or reason to know factor weighs in her favor, as does, to some extent, the mental or physical health factor. No factor, at least if applied rigorously in accordance with the guidelines of Rev. Proc. 2013-34, supra, would weigh against granting relief. Given a broad interpretation, however, the compliance with income tax laws factor would weigh against petitioner at least to the extent of her culpability for the failure to acknowledge on her Forms 8857 her receipt of substantial insurance proceeds as a result of Mr. Hale's death.

By their terms, however, the factors listed in Rev. Proc. 2013-34, supra, are not to be applied by simply toting up favorable and unfavorable factors, giving equal weight to each:

> In determining whether it is inequitable to hold the requesting spouse liable for all or part of the unpaid income tax liability or deficiency, and whether full or partial equitable relief under * * * section 6015(f)

**[*42]** should be granted, all the facts and circumstances of the case are to be taken into account.  The factors listed * * * [in Rev. Proc. 2013-34, sec. 4.03(2)] are designed as guides and not intended to comprise an exclusive list.  Other factors relevant to a specific claim for relief may also be taken into account in making the determination.  In evaluating a claim for relief, no one factor or a majority of factors necessarily determines the outcome.  The degree of importance of each factor varies depending on the requesting spouse's facts and circumstances. * * *

Rev. Proc. 2013-34, sec. 4.03(2), 2013-43 I.R.B. at 400.  Moreover, as noted above, while we routinely consider the Commissioner's published guidelines when reviewing his determination not to provide relief under section 6015(f), we are not bound by them.

Our charge under the statute is to determine, taking into account all of the facts and circumstances, whether it would be inequitable to deny petitioner a refund of any taxes she can establish that she paid for the taxable years 2004 through 2009.  We are not convinced it would be.  Because the claims against Mr. Hale's estate exceeded its probate assets, allowing petitioner the refund she seeks would most likely prevent respondent from collecting the tax in issue.  For two principal reasons, we see no inequity in requiring petitioner to bear the burden of that tax.  First, by her own admission, payment of the tax did not cause her economic hardship.  And second, the payments were necessarily funded with the proceeds of insurance policies on Mr. Hale's life, the premiums for which were

[*43] paid out of his income--policies that Mr. Hale might have been forced to allow to lapse had he paid the couple's tax liabilities. Thus, giving petitioner the benefit of every doubt--that she reasonably relied on Mr. Hale to pay the tax due and did not realize that he had not, that the only benefits she received from his failure to pay the tax were the result of his decisions, and that, in her understandable shock and grief, she reasonably relied on family members and advisers to reinvest the insurance proceeds she received and determine what assets needed to be reported on the Forms 8857 she submitted--we are not convinced that equity justifies granting her the relief she seeks. Even under those circumstances, it does not strike us as manifestly unfair to require the tax to be paid out of the proceeds from insurance policies funded during the years in issue using amounts that would otherwise have been available to pay the tax--particularly given respondent's likely inability to collect the tax from any other source if he refunds the amounts petitioner paid.

## III. Source of Payments

Because we conclude that petitioner is not entitled to a refund of any tax she paid for the years in issue, we need not resolve the parties' dispute about the source of the payments made to satisfy the Hales' tax liabilities for those years. Petitioner implicitly acknowledges that, under Kaufman v. Commissioner, T.C.

**[*44]** Memo. 2010-89, she would not be entitled to a refund of any taxes paid by Mr. Hale's estate. In <u>Kaufman</u>, we held that a taxpayer requesting innocent spouse relief was not entitled to a refund of taxes paid by her husband's estate, even though she was the estate's administrator and sole beneficiary. Petitioner attempts to distinguish <u>Kaufman</u> on the ground that she paid the tax for the years in issue herself, out of the proceeds of insurance on Mr. Hale's life. Although the insurance proceeds were part of Mr. Hale's gross estate for Federal estate tax purposes, <u>see</u> sec. 2042 (and apparently for Tennessee inheritance tax purposes as well), the insurance proceeds were not part of Mr. Hale's probate estate. Petitioner asks us to infer that, because "[t]here were no probate assets that could have paid the tax liability", the tax must have been paid out of the life insurance proceeds she received. Respondent argues that, while petitioner is not entitled to any relief under section 6015(f), even if she were entitled to relief, her refund should be "limited to $350,273.10 because this is the amount which she paid toward the joint income tax liabilities." Respondent alleges that "[t]he Estate of Stephen Hale paid the remaining $1.5 million." Because we agree with respondent that petitioner is not entitled to any relief under section 6015(f), the question of the source of the $1.5 million tax payment made on July 12, 2002, is moot.

**[*45]** IV.   <u>Conclusion</u>

Petitioner is not entitled to a refund of any amounts she paid in satisfaction of her and Mr. Hale's Federal income tax liabilities for the years in issue.

<u>Decisions will be entered for</u>

<u>respondent</u>.